**Mark A. WIELAND,
Petitioner, Appellant,**

v.

**STATE of Minnesota, Respondent.**

No. C5–89–1592.

Supreme Court of Minnesota.

July 13, 1990.

Frederick J. Goetz, Calhoun Square, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Robert A. Stanich, Sp. Asst. Atty. Gen., St. Paul, and W.M. Gustafson, Nicollet Co. Atty., St. Peter, for respondent.

SIMONETT, Justice.

Petitioner Mark Wieland appeals from an order of the Redwood County District Court denying his petition for postconviction relief. The petition was based on a claim of newly-discovered evidence. After hearing arguments of counsel and reviewing the deposition of petitioner's expert, the postconviction court denied petitioner's request for a new trial. We affirm.

On October 7, 1978, a jury found petitioner guilty of first-degree premeditated murder, attempted first-degree murder, and ag-

gravated assault. *See* Minn.Stat. §§ 609.-185(1) (1988); 609.17 (1988); 609.225, subd. 2 (1978). Although petitioner tendered an insanity defense, the jury concluded that petitioner was not legally insane at the time of the incident.

The evidence at trial revealed the following events. In the early afternoon on February 2, 1978, petitioner, then 19 years old, drove to the rural home of Joyce and Kenneth Engel near New Ulm, ostensibly to use the phone. Petitioner, a stranger to the Engels, dialed his home but knew nobody would answer. Petitioner left the home but returned in about a half hour and again used the phone. After this second phone call, he went to his car and returned with a gun. (The gun, apparently not loaded at the time, could not fire bullets because of a broken firing pin.)

Petitioner ordered Mrs. Engel and her teenage son, Charles, to follow his commands. He told Mrs. Engel to write out four checks for $500.00 each. Next, in the kitchen, petitioner took from his pocket strapping tape and a knife to cut it. He then ordered Mrs. Engel to tape her son's hands behind his back. Petitioner taped Mrs. Engel's hands and feet, left her on the kitchen floor, and directed Charles to an adjacent bedroom where he taped Charles' feet. While in the bedroom, he looked out the window, and he asked if anyone else was home. By the time petitioner returned to the kitchen, Mrs. Engel had freed her hands. Petitioner allowed her to get a drink of water, retaped her hands, again told her to lie on the floor face down, and placed a chair over her.

Petitioner then went back into the bedroom. When he returned to the kitchen, he began to go through the drawers. Petitioner later told the admitting psychologist at the Minnesota Security Hospital that he first thought of killing his bound victims when he saw a knife in the kitchen drawer. He took the knife and stood behind Mrs. Engel. Even though Mrs. Engel pleaded with petitioner, he stabbed her once in the left shoulder. Petitioner then went into the bedroom and, as Charles rolled across

the bed to avoid the attack, he fatally stabbed the boy once in the chest.

Mrs. Engel pretended she was dead. Petitioner wiped off the drawers and door frame he had touched. He later stated that he did this to make detection more difficult, as he thought authorities had his fingerprints on file. Petitioner took with him the kitchen knife, the gun, the roll of tape, and the knife with which he had cut the tape.

Petitioner drove his car into a snow-filled ditch about one-quarter mile from the Engels'. He then enlisted the help of a nearby resident, Ernst Sauer, to take him to New Ulm to hire a tow truck. Petitioner later stated that the car was registered in his name and he wanted to get it out of the ditch to avoid detection. It is also noteworthy that petitioner had put reflective tape on his license plates to change a "C" to an "O". An ambulance was at the Engel residence as Sauer and petitioner drove by on the way to New Ulm. At the service station, petitioner flushed the four checks down the toilet, another step which petitioner admitted was to avoid apprehension. Petitioner was arrested near the Engels' farm home after the tow truck stopped to assist a squad car which had slid off the road.

After receiving the *Miranda* warning and being asked if he wanted to talk, petitioner stated, "I did it, and the knife is under the front seat of the car, on the driver's side." Petitioner further confessed to the crime while being transported to jail. At the jail petitioner gave a recorded confession. During this interview, petitioner was careful not to answer questions about whether he planned to kill the Engels. Petitioner stated, "[I]f I planned it ahead it's premeditated." Similarly, he said, "I could bring in people who say I'm sometimes nuts, so I do not wish to answer that question." Petitioner later told an expert for the prosecution that he wanted to commit the "perfect crime" of burglary or robbery on the day of the incident. On several occasions during an interview with a defense expert he spontaneously suggested "that perhaps he had committed the

robbery and killings [sic] in order to see if he could get away with it."

Four experts testified during the insanity defense stage of the trial. The chief psychologist at the Minnesota Security Hospital, who testified for the defense, concluded that at the time of the crimes petitioner suffered from an acute schizophrenic reaction or an incipient paranoid schizophrenic disorder. Another defense expert concluded that Wieland was a paranoid schizophrenic. While the two experts for the defense thought Wieland was legally insane at the time of the incident, the prosecution's experts thought he was sane. *See* Minn.Stat. § 611.026 (1988). Indeed, Wieland admitted to one of the State's experts that he knew he was doing something wrong at the time of the crimes.

Wieland now contends that he was misdiagnosed by his experts. He claims he was not suffering from a schizophrenic illness at the time of the incident; rather, he asserts that he was suffering from a "profound degree of hyperthyroidism." Hyperthyroidism, according to petitioner's expert, can produce manifestations similar to schizophrenia. Petitioner contends that this is newly-discovered evidence which is admissible to show his inability to premeditate and form specific intent and, therefore, his sentence should be vacated and a new trial granted.[1]

The State contends that the proffered evidence is inadmissible on the issues of intent and premeditation pursuant to our decision in *State v. Bouwman*, 328 N.W.2d 703 (1982). The petitioner contends, on the other hand, that *Bouwman* does not render the evidence inadmissible on those issues. We need not, however, resolve this dispute. We conclude that even if the evidence were admissible to rebut evidence of intent and premeditation, petitioner has failed to show he is entitled to a new trial.

◼ A petitioner seeking postconviction relief has the burden of establishing, by a fair preponderance of the evidence, facts which warrant a reopening of the case. Minn.Stat. § 590.04, subd. 3 (1988). The decision whether to grant a new trial based upon newly-discovered evidence rests with the trial court and will not be disturbed unless there is an abuse of discretion. *Berry v. State*, 364 N.W.2d 795, 796 (Minn. 1985).

◼ A new trial may be granted where the petitioner establishes (1) that the newly discovered evidence was not within petitioner's or his counsel's knowledge before trial; (2) that the evidence could not have been discovered through due diligence before trial; (3) that it is not cumulative, impeaching, or doubtful evidence; and (4) that the evidence would probably produce a different or more favorable result. *Id.* (quoting *State v. Caldwell*, 322 N.W.2d 574, 588 (Minn.1982)).[2] Additionally, we have held that "[g]enerally expert testimony does not constitute newly discovered evidence warranting a new trial." *State v. Blasus*, 445 N.W.2d 535, 543 (Minn.1989) (citation omitted); *cf. Swanson v. Williams*, 303 Minn. 433, 436, 228 N.W.2d 860, 862–63 (1975).

◼ To support his request for a new trial, petitioner submitted the deposition of Dr. Michael Popkin to the postconviction court. According to Dr. Popkin, hyperthyroidism results from the production of an excessive amount of a thyroid hormone. The manifestations vary from a perceptible increase in anxiety to a "frank psychotic presentation" which may be similar to schizophrenia, where those afflicted may

---

1. In the original petition, filed in May 1988, petitioner claimed the evidence was relevant to the insanity defense. In his amended petition, filed in May 1989, this position was abandoned.

2. As we observed in *Caldwell*, there is a significant difference between a motion for a new trial where the claim is based on recanted or false testimony and one where there is a claim of newly-discovered evidence. 322 N.W.2d at 584–86. In the latter case, there is a "heightened standard of materiality—that the new evidence 'probably' would produce a different result * * *." *Id.* at 585. This is justified because the evidence has not yet been tried and, therefore, a judge must anticipate the effect on a second trial. Where there is recanted or false testimony, the concern is with the effect on the trial already had, and, therefore, the party must only show that the outcome "might" have been different. *Id.*

become paranoid, delusional, and impulsive. Dr. Popkin stated that hyperthyroidism may contribute to antisocial activity because of impaired impulse control and paranoid delusions which can accompany the disease.

Dr. Popkin testified that he thought petitioner was suffering from hyperthyroidism on the day of the incident. He came to this conclusion principally by piecing together information from several sources. First, there was evidence from the 1978 admittance report at the Minnesota Security Hospital that is consistent with hyperthyroidism; the admittance physical revealed that petitioner had elevated pulse and blood pressure, an enlarged thyroid, a history of hypertension, and was overweight. Second, petitioner was diagnosed about a month after the crime as being a paranoid schizophrenic, which is consistent with hyperthyroidism. Third, in 1982, petitioner was diagnosed as having Graves disease, a specific form of hyperthyroidism. Petitioner's thyroid was three times its natural size and required ablation. Finally, Dr. Popkin says petitioner was not schizophrenic when Dr. Popkin diagnosed him in 1988.

While Dr. Popkin's opinions arguably establish by a fair preponderance that petitioner had a thyroid problem in 1978, the extent of the affliction is speculative. Significantly, Dr. Popkin admitted that there is no way to measure how overactive petitioner's thyroid was at or near the time of the crimes. Dr. Popkin stated that the records show that petitioner had "objective features of hyperthyroidism at an earlier point before it progresses," but he also conjectured that petitioner's thyroid may have been three times its normal size in 1978. Also troubling is Dr. Popkin's admission that there is no linear relationship between the hyperactivity of the thyroid and the behavioral and psychological manifestations. While Dr. Popkin felt that hyperthyroidism was "the most logical explanation" for petitioner's manifested symptoms at the time of the crime, he also admitted that there may be other explanations.

Dr. Popkin's testimony as to the relationship between petitioner's thyroid problem and his criminal behavior is also tenuous. He stated that "it was a contributing factor in the sense that it resulted in his having impaired cognition, disturbance in reality testing, and reduced impulse control." He also used the words "central" and "integral."

Understandably, Dr. Popkin's testimony necessarily was based, in large part, on speculation. The weakness in Dr. Popkin's testimony, however, is not the only difficulty with petitioner's claim. There was strong evidence that petitioner premeditated the attacks. For instance, petitioner went to the home twice under the pretext of using the phone; he returned with a gun to control his victims and tape to bind them; he stated he thought of killing the Engels when he saw the knife; he wiped off his fingerprints, tore up the checks, and altered his license plates to make detection difficult; and he admitted he knew what he was doing was wrong and stated he was out to commit a crime that day.

The solid evidence of premeditation, when juxtaposed with the tenuous nature of Dr. Popkin's hypotheses, leads us to conclude that petitioner has failed to show that there would probably be a more favorable result if the proffered evidence was admitted at retrial on the issues of intent and premeditation.[3] In other words, it is more likely than not that petitioner would be convicted of the same crimes. Finally, we note that petitioner's severe thyroid problem was treated in 1982 and the first petition was not filed until 1988, 10 years after the convictions. This delay in seeking postconviction relief also weighs against petitioner. *Jones v. State*, 288 Minn. 527, 529, 179 N.W.2d 315, 317 (1970). The postconviction court did not abuse its

---

**3.** In this regard, the record fully supports the postconviction court's conclusion that "What happened was not sudden, unconsidered, action but a series of related conduct * * *. There was no sudden act in rage, startled reaction to unexpected developments, or other indicia of impulsive, unthinking action such as might be caused by reduced impulse control associated with his disease Petitioner now argues to explain his behavior."

discretion in denying the petition, and, accordingly, its order is affirmed.

Affirmed.