STATE of Minnesota, Respondent,

v.

Keonne Alexander PALMER,
Appellant.

No. A10–1356.

Supreme Court of Minnesota.

Sept. 28, 2011.

728

730

Lori Swanson, Attorney General, Matthew Frank, Assistant Attorney General, St. Paul, MN; and Janelle Kendall, Stearns County Attorney, St. Cloud, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Theodora Gaïtas, Assistant State Public Defender, St. Paul, MN, for appellant.

## OPINION

ANDERSON, G. BARRY, Justice.

The Stearns County District Court, following a bench trial, found Keonne Alexander Palmer guilty of first-degree premeditated murder, second-degree intentional murder, and possession of a firearm by a prohibited person, in the shooting death of Ernest Moss. The court sentenced Palmer to life in prison without the possibility of release based on the first-degree premeditated murder conviction. On appeal, Palmer argues that the evidence was insufficient to support a conviction of premeditated murder. In a pro se supplemental brief, Palmer argues that the court should have considered lesser-included manslaughter offenses, that the district court did not properly pronounce Palmer's sentence, and that Palmer received ineffective assistance of trial counsel. We affirm.

A failed drug transaction between friends led to the death of Ernest Moss. About 2 weeks before the homicide, Keonne Palmer's brother, Da'Leino Palmer ("Da'Leino"), provided crack cocaine to Moss with the understanding that Moss would pay Da'Leino $250 to $300 within a week. Da'Leino, in turn, owed money to the individuals who provided him with the cocaine. According to Da'Leino, Moss did not pay as agreed.

Until the cocaine sale, Moss, Palmer, and Da'Leino were friends. Da'Leino and Palmer frequently visited Moss at his home, but Da'Leino stopped visiting Moss because of the debt. Three to four days before the shooting, Da'Leino began fre-

quently calling Moss attempting to collect on the debt; Moss ignored these calls.

On the day of the shooting, April 29, 2009, Da'Leino was with M.H., his girlfriend, and J.T., a friend, in M.H.'s apartment in St. Cloud. J.T. testified that Da'Leino received several telephone calls that he did not answer. Da'Leino became agitated in response to the calls, saying that he needed the money from Moss.[1] At some point, Da'Leino gave his .22–caliber revolver to J.T. to carry in her purse. J.T. had carried Da'Leino's gun for him in the past because Da'Leino has a felony conviction and is not legally permitted to carry a firearm. Palmer had taken the cartridges out of the gun the previous week, so the gun was not loaded when given to J.T.

Da'Leino, M.H., and J.T. got in Palmer's car, which Da'Leino had borrowed from Palmer a couple weeks earlier. The three made some stops, and then picked up Palmer from his home in Richmond to drive him to work in St. Cloud. On the way to St. Cloud, Palmer and Da'Leino discussed the Moss debt. M.H. heard Palmer and Da'Leino mention that Moss was supposed to have Da'Leino's money by noon that day. Da'Leino and J.T. testified that while in the car, Palmer asked Da'Leino for the gun and Da'Leino told J.T. to give the unloaded gun to Palmer. Palmer testified that Da'Leino asked him for the bullets. Palmer, who had brought the ammunition with him that day, then wiped the individual cartridges with his sweatshirt to remove his fingerprints before loading the cartridges into all nine chambers of the gun. Palmer then placed the gun under the front passenger seat of the car—a usual location for the gun. Da'Leino dropped off M.H. and J.T. at M.H.'s apart-ment, and Palmer and Da'Leino drove to Moss's house.

Earlier that day, J.M., a friend of Palmer and Moss, went to Moss's house. J.M. testified that around noon Moss took a phone call and was initially arguing with the person on the other end, but the conversation ended positively. Moss told J.M. that he was talking to Palmer about money that Moss's neighbor, B.M., owed Da'Leino for crack cocaine. J.M. left at around 2:30 p.m., as Moss left to pick up his two children from school.

*The shooting.*

Palmer and Da'Leino were already waiting at the Moss home when Moss arrived with his children. Moss's oldest son testified that he and his brother went into a bedroom and an argument began between the men in the living room moments after the children left, although Da'Leino and Palmer testified that the argument started 5 to 20 minutes after they entered the house. During the argument, Da'Leino learned that B.M., the neighbor, owed Moss money; Da'Leino left the house, went to the car to get his gun, and then went to B.M.'s house—which was the other side of Moss's duplex. Moss went over to B.M.'s house as well, and Moss spoke with B.M.'s wife, who told Moss that B.M. was not home at the time.

Shortly thereafter, the argument continued outside, becoming "heated" and "loud." Palmer was standing between Moss and Da'Leino. Da'Leino testified that Palmer was telling Moss that Moss would have to pay Da'Leino the money Moss owed, but Palmer testified that he was merely trying to keep the peace. Moss, who was holding his cordless tele-

1. One possible inference from this testimony was that the individuals who provided Da'Leino with the cocaine were attempting to collect their money from Da'Leino, although Da'Leino testified that he had repaid his debt to the individuals before the day of the shooting.

phone, threatened to call the police and then did so by dialing 911. When Moss threatened to call the police, Da'Leino pulled the gun out of his waistband and began to point it at Moss with his finger on the trigger. Palmer grabbed the barrel of the gun with his left hand, took the gun from Da'Leino, transferred the gun to his right hand, and then said something to the effect of "no you [a]ren't." Palmer then shot Moss five times, firing two to three shots, pausing for 2 to 5 seconds, and then firing the remaining shots. Da'Leino, in describing the scene to a family member soon after the shooting, stated that Palmer "stood over [Moss] and finished him off." After the shooting, the phone was on the ground with the battery dislodged, presumably because Moss dropped the telephone as Palmer shot him. Moss's 911 call had been disconnected.

It is undisputed that Palmer shot Moss five times; once each in the back, neck, left shoulder, abdomen, and head. The bullets entered Moss's body from the front, back, and side, and hit Moss at varying trajectories. The entrance wounds and bullet trajectories showed that either Moss or Palmer moved between shots. Additionally, the evidence indicated that Moss was shot while he was crouched, falling, or already on the ground. Specifically, bullets entering Moss with a downward trajectory indicated that the gun was higher than the wound. One bullet hit Moss, who was 6 feet 1 inch tall, in the head with a downward trajectory. Palmer is 5 feet 6 inches tall, and testified that he held the gun straight out in front of him. At trial, Palmer admitted that he had experience with a .22–caliber firearm and that he knew multiple shots would be required to do much damage with a gun of that caliber.

*After the shooting.*

After the shooting, the brothers split up. Palmer ran down an alley, where he threw his hat into a bucket, wrapped the gun in his sweatshirt, and put the sweatshirt and the gun into a garbage bag. Police officers caught Palmer soon thereafter. He lied to the police about where he was and whether he had been at Moss's house at the time of the shooting. Later, after admitting he had been at Moss's house, Palmer lied about his involvement in the shooting.

Da'Leino went inside Moss's house immediately after the shooting. He went to the closet where Moss kept his marijuana and took $20 and an electronic scale. Da'Leino then ran to M.H.'s apartment and told M.H. and J.T. what happened. The three borrowed a car and eventually drove to Palmer's place in Richmond. Police officers had already arrested Palmer at this point. While at Palmer's residence, Da'Leino spoke with Palmer's wife and a cousin's girlfriend. After Da'Leino spoke to these family members, everyone was getting in the car to leave when police officers arrived and arrested Da'Leino.

Palmer was indicted on four counts: (1) first-degree premeditated murder, Minn. Stat. § 609.185(a)(1) (2010), (2) first-degree murder while committing a felony (drug sale), Minn.Stat. § 609.185(a)(3) (2010), (3) second-degree intentional murder, Minn. Stat. § 609.19, subd. 1(1) (2010), and (4) possession of a firearm by a prohibited person, Minn.Stat. § 624.713, subd. 1(2) (2010). The district court conducted a 5–day bench trial and found Palmer guilty of counts (1), (3), and (4), and not guilty of count (2). The court sentenced Palmer to life imprisonment with no possibility of release based on his conviction for first-degree premeditated murder, and this appeal followed.

I.

Palmer's only argument in his principal brief is that the evidence was insufficient

to support a finding that Palmer premeditated the murder. Palmer claims that the circumstantial evidence used to prove premeditation did not unerringly point to Palmer's guilt and was therefore insufficient to convict Palmer of first-degree premeditated murder. The State argues that the circumstantial evidence was sufficient to support a conviction for first-degree premeditated murder.

■ We use the same standard of review in bench trials and in jury trials in evaluating the sufficiency of the evidence. *State v. Holliday,* 745 N.W.2d 556, 562 (Minn.2008). We "will view the evidence in the light most favorable to the verdict and assume that the factfinder disbelieved any testimony conflicting with that verdict." *Id.* (citation omitted) (internal quotation marks omitted). "The verdict will not be overturned if, giving due regard to the presumption of innocence and the prosecution's burden of proving guilt beyond a reasonable doubt, the [factfinder] could reasonably have found the defendant guilty of the charged offense." *State v. Leake,* 699 N.W.2d 312, 319 (Minn.2005).

■ The evidence of premeditation in this case was largely, although not exclusively, circumstantial. We use a two-step analysis for deciding whether the circumstantial evidence was sufficient to sustain a guilty verdict:

> First, we must identify the circumstances proved, giving deference "to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State." Second, we independently examine "the reasonableness of all inferences that might be drawn from the circumstances proved," including inferences consistent with a hypothesis other than guilt.

*State v. Anderson,* 789 N.W.2d 227, 241–42 (Minn.2010) (quoting *State v. Andersen,* 784 N.W.2d 320, 329 (Minn.2010)) (internal citations omitted). For the first step, we defer to the factfinder; for the second step, we engage in our own examination of the reasonableness of the inferences. *State v. Al–Naseer,* 788 N.W.2d 469, 473–74 (Minn.2010). The second step requires us to determine whether the circumstances proved are "consistent with guilt and inconsistent with any rational hypothesis except that of guilt," not simply whether the inferences that point to guilt are reasonable. *Andersen,* 784 N.W.2d at 330; *see also Al–Naseer,* 788 N.W.2d at 474. In other words, the evidence "must point unerringly to the accused's guilt." *State v. McArthur,* 730 N.W.2d 44, 49 (Minn.2007) (citation omitted) (internal quotation marks omitted). But we will not overturn a guilty verdict on conjecture alone. *Anderson,* 789 N.W.2d at 242. Additionally, we view the evidence as a whole, not as discrete and isolated facts. *Andersen,* 784 N.W.2d at 332; *State v. Moore,* 481 N.W.2d 355, 361 (Minn.1992) ("[T]he evidence as a whole may support a finding of premeditation even if no single piece of evidence standing alone would be sufficient.").

### A.

■ The first step is to determine whether the circumstances proved are consistent with guilt of first-degree premeditated murder. First-degree premeditated murder is committed when an individual "causes the death of a human being with premeditation and with intent to effect the death of the person or of another." Minn. Stat. § 609.185(a)(1). "Premeditation," for the purposes of first-degree premeditated murder, "means to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn.Stat. § 609.18 (2010).

We have said the following with regard to premeditation:

Premeditation requires some amount of time to pass between formation of the intent and the carrying out of the act. But proving premeditation does not require proof of extensive planning or preparation to kill, nor does it require any specific period of time for deliberation.

*State v. Vang,* 774 N.W.2d 566, 583 (Minn. 2009) (citations omitted) (internal quotation marks omitted). Evidence of premeditation generally falls into three categories: planning activity, motive, and nature of the killing. *Anderson,* 789 N.W.2d at 242.

In the past, we have stated intent to kill and premeditation can occur simultaneously. *See, e.g., State v. Jackman,* 396 N.W.2d 24, 30 (Minn.1986). Our more recent cases have rejected the notion that premeditation and intent to kill can occur simultaneously because that notion confuses the distinction between first-degree premeditated murder and second-degree intentional murder. *See Moore,* 481 N.W.2d at 360–61 (stating that the past approach to premeditation and intent to kill "blurs the line between first and second degree murder when it is evident that the legislature intended the line to be sufficiently distinct to justify punishing persons convicted of the different crimes differently"). We reaffirm that distinction today. Therefore, for the evidence to be sufficient to convict of first-degree premeditated murder, a defendant must have formed the intent to kill, and then must have had "some appreciable time" in order to "consider, plan or prepare for, or determine to commit" the killing. Minn.Stat. § 609.18; *Moore,* 481 N.W.2d at 361.

As outlined above, we identify the circumstances proved, giving deference to the factfinder's conclusions, and then independently examine whether the inferences drawn from those circumstances unerringly point to guilt. We address the evidence of planning activity, motive, and the nature of the killing in turn.

1.

Planning activity consists of "facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing." *State v. Hughes,* 749 N.W.2d 307, 313 (Minn.2008) (citation omitted) (internal quotation marks omitted). Planning activity may consist of "prior possession of the murder weapon by the defendant, sneaking up on the prospective victim, or taking the prospective victim to a location where others are unlikely to intrude." *Id.*

The circumstances proved include the following evidence of planning activity: Palmer loaded the murder weapon and wiped his fingerprints off the cartridges before loading them into the gun; Palmer placed the gun in a location where both Palmer and Da'Leino had access, instead of giving the gun back to J.T. to put in her purse; and Palmer and Da'Leino waited for Moss at his house at a time when Da'Leino and Palmer knew he would be arriving with his two children.

Palmer had "prior possession" of the murder weapon. *See Hughes,* 749 N.W.2d at 313. Not only did Palmer possess the murder weapon, he loaded the weapon and placed it under the car seat rather than returning it to J.T. We have concluded that an inference of planning activity could be drawn when the "defendant removed the shotgun from its normal storage place under the bed, loaded it, and placed it on the shelf in the living room early on the day of the killing." *Moore,* 481 N.W.2d at 361. In this case, Palmer took the gun from one location, loaded it, and placed it in a different location where both Da'Leino and Palmer would have access to it later.

Even though the under-the-seat location was not an unusual location for the gun, the gun was moved to a more accessible location before the shooting.

Not only did Palmer have prior possession of the murder weapon, he wiped his fingerprints off of the cartridges before loading the cartridges into the gun. That action demonstrates Palmer was preparing for an illegal use of the gun. *See Wieland v. State*, 457 N.W.2d 712, 715 (Minn.1990) (concluding that wiping the fingerprints off of the murder weapon to avoid detection was strong evidence of premeditation).

■ Waiting for the victim can be evidence of planning as well. In *State v. Alton*, we noted that there was evidence of premeditation when the defendant waited for the victim to come home. 432 N.W.2d 754, 757 (Minn.1988). Here, Palmer and Da'Leino waited for Moss outside of his house for some time before Moss arrived with his children.

■ Palmer argues the circumstances proved show a lack of planning activity because Palmer shot Moss in public, in the middle of a loud argument, and after talking with the neighbor. Palmer was also quickly apprehended, indicating a poorly-planned getaway. Premeditation requires only evidence that the defendant "consider, plan or prepare for, or determine to commit" the crime. Minn.Stat. § 609.18. Premeditation does not require proof of extensive planning. *See Hughes*, 749 N.W.2d at 312. Moreover, although police officers quickly apprehended Palmer, Da'Leino managed to steal items from Moss's home, and then evade capture until later in the evening.

Palmer also argues that the murder was not planned because Palmer left the gun in the car and Da'Leino, not Palmer, retrieved the gun. Although Da'Leino retrieved the gun from the car, Palmer and Da'Leino both knew where the gun was located and Palmer saw Da'Leino go to the car before Da'Leino attempted to confront Moss's neighbor. Then, even though Da'Leino was holding the gun and starting to aim at Moss with his finger on the trigger, Palmer took the gun away from Da'Leino. Simply because Da'Leino possessed the murder weapon in between Palmer's loading of the weapon and Palmer's eventual use of the weapon to kill does not negate the evidence of planning activity.

### 2.

■ The second category of premeditation evidence is motive. Evidence of motive is unnecessary to a finding of premeditation; but, if motive is present, "it can help strengthen a finding that the defendant deliberated about the killing." *Anderson*, 789 N.W.2d at 242. Motive evidence includes "prior threats by the defendant to do violence to the victim, plans or desires of the defendant which would be facilitated by the death of the victim, and prior conduct of the victim known to have angered the defendant." *Hughes*, 749 N.W.2d at 314 (citation omitted) (internal quotation marks omitted).

The circumstances proved include the following evidence of motive: Palmer told Da'Leino that he would get Da'Leino's money back from Moss; Palmer called Moss earlier in the day and had an initially-argumentative conversation; Da'Leino and Moss had a strained relationship; Da'Leino was pressured to pay the money he owed; the three men engaged in a heated argument before the shooting; and Moss threatened to call the police.

Viewing the evidence in the light most favorable to the verdict, the debt and resulting anger over the debt support a motive for the shooting. *See, e.g., State v. Nunn*, 561 N.W.2d 902, 908 (Minn.1997) (concluding that the actions the defendant

would take to retrieve money and drugs that he believed were stolen and to punish those responsible were related to motive and relevant to premeditation). M.H. told prosecutors that she heard Palmer and Da'Leino say that Moss was supposed to have money by noon on the day of the shooting, and the shooting took place shortly after 3:00 p.m. There was extensive testimony of a loud and heated argument between Palmer, Da'Leino, and Moss that spilled outside. *See State v. Yang*, 774 N.W.2d 539, 561 (Minn.2009) (concluding that an argument in an alley and a physical fight "provided strong evidence of motive"). Da'Leino testified that Palmer became upset when Moss attempted to start a fight with Da'Leino and "tried to rush" Da'Leino. Palmer also responded verbally to Moss's threat to call the police before shooting.

These facts are similar to *State v. Holliday*, in which a fight broke out inside a movie theater, and the police forced everyone outside. 745 N.W.2d at 559. Two groups "squared off" in the street by yelling and "rais[ing] their shirts up at each other." *Id.* at 559–60. Holliday saw someone in the opposing group reach behind his back, and Holliday took out his revolver and pointed it at the group. *Id.* at 560. As the opposing group fled, Holliday ran across the street aiming and shooting at one person. *Id.* We held that "[t]he context of the confrontation and the other person's act of reaching behind his back provided a motive for [Holliday] to shoot at someone in that person's group, thereby supporting the district court's finding of premeditation." *Id.* at 563. Here, like *Holliday*, a confrontation began indoors and continued outside. There was a loud argument and one of the individuals threatened to call the police to the detriment of Palmer and Da'Leino. The motive evidence in these two cases is comparable.

Palmer argues that because Moss told Palmer that Moss would get Da'Leino's money by Friday, there was no motive to kill Moss before Friday. Contrary to Palmer's argument, there was also testimony that Moss was supposed to have the money by noon on the day of the shooting, not Friday. Additionally, as Da'Leino did here, stealing items from the victim's house is a method of debt recovery. Moreover, Palmer's argument does not address Palmer's motivation to prevent Moss from calling the police. Palmer's argument that he had no motive to kill Moss is not persuasive.

3.

 The third category of premeditation evidence is the nature of the killing. The evidence relevant to the nature of the killing includes "the defendant's actions before, during, and after the killing." *Anderson*, 789 N.W.2d at 242. This type of evidence includes, but is not limited to, "the number of wounds inflicted, infliction of wounds to vital areas, infliction of gunshot wounds from close range, [and] passage of time between infliction of wounds." *State v. McArthur*, 730 N.W.2d 44, 50 (Minn.2007). An indication that a shooter took careful aim at the victim may also indicate premeditation. *Anderson*, 789 N.W.2d at 242.

The circumstances proved include the following evidence relating to the nature of the killing: Palmer told Moss that Moss would not call the police just prior to the shooting; the location of Moss's wounds; Palmer paused in the middle of shooting; Palmer "stood over [Moss] and finished him off;" and Palmer admitted that he knew a small-caliber gun would not do much damage.

Palmer shot Moss a few times and then "stood over [Moss] and finished him off." Such a characterization strongly indicates premeditation and other evidence rein-

forces that characterization. The downward trajectories of some of the bullet paths, including the bullet that hit Moss's head, indicate an elevated position for the shooter. Put another way, Palmer was standing over the crouching, falling, or prone Moss. The location of the entrance wounds in the front, back, and side of Moss's body indicate that Moss or Palmer moved between shots. The testimony indicating that Palmer paused for as many as 5 seconds between shots also reinforces the characterization that Palmer "stood over [Moss] and finished him off." The foregoing evidence shows that Palmer had time to consider his actions before committing the crime.

The State established that all five of Palmer's shots hit Moss, even though Moss or Palmer moved between shots. All five shots hit Moss in the head or upper body close to his chest. At trial, Palmer admitted that he knew that a small-caliber gun, like the one he used, would not do much damage unless the victim was shot many times. All these facts indicate that the shooter took careful aim and hit the most vulnerable parts of Moss's body.

The facts of this case are similar to *State v. Clark*, 739 N.W.2d 412 (Minn.2007). In *Clark*, we concluded that the nature of the killing indicated premeditation because Clark shot the victim twice. *Id.* at 423. Both shots were fatal wounds, and the evidence showed Clark shot the victim "in the back after she was already lying on the floor." *Id.* Here, we have similar evidence indicating that Palmer paused and shot Moss while he was down. Also, all of the bullets hit Moss near his head and chest, indicating "deliberately placed gunshot wounds." *See id.*

Immediately before shooting Moss, Palmer told Moss that Moss would not call the police. This sequence of events is similar to what occurred in *Moore*, in which a husband killed his wife with a shotgun, and the husband's daughter heard him say something to the effect of "Good-bye Debra, I'm going to kill you," immediately before the shooting. 481 N.W.2d at 359. We held that this fact alone "permits an inference that defendant had sufficient time to contemplate his actions before carrying them out." *Id.* at 362. Not only did Palmer tell Moss that Moss would not call the police immediately before the shooting, Palmer also shot, paused, and then shot Moss multiple times. *See also State v. Tomassoni*, 778 N.W.2d 327, 333–34 (Minn.2010) (recognizing that evidence of premeditation can include testimony that "a short amount of time elapsed between" two gunshots); *State v. Fort*, 768 N.W.2d 335, 343 (Minn.2009) (concluding that a burglar who stated "if you don't shut up, I'm going to kill you," and "now you're going to die" when the victim continued to scream verbalized the planning activity and was "sufficient to prove premeditation").

Palmer argues that the shooting had a "scattershot" nature, indicating a lack of premeditation. The circumstances proved do not support this argument. Palmer shot five times and every bullet hit Moss in the chest or head region. Palmer paused for up to 5 seconds, "stood over [Moss] and finished him off." The shooting was not "scattershot."

### B.

Having established that the circumstances proved as a whole are consistent with first-degree premeditated murder, we next ask whether the circumstances proved support a reasonable inference other than guilt. *See Andersen*, 784 N.W.2d at 331. Palmer's theory of the case is that Palmer's decision to shoot Moss was not premeditated, but was "unconsidered" and a "rash impulse." Based on all the evi-

dence, we conclude that this theory is not reasonable.

Palmer's theory of the case—that the shooting was a rash impulse—is inconsistent with the circumstances proved as a whole. First, Palmer loaded the gun after wiping his fingerprints off of the cartridges. This act of loading the murder weapon with clean cartridges involves foresight, and is not a rash impulse. Palmer argues the gun could have been loaded to be used as a scare tactic. But, a scare tactic does not require removing the fingerprints from the cartridges. Also, Da'Leino asked for the gun after receiving phone calls earlier in the day that were likely in relation to the debt. Palmer and Da'Leino spoke about the debt in the car, and Palmer loaded the gun during the same ride. These facts indicate that there was a plan to use the firearm.

Second, it is not a rash impulse to shoot, pause for up to 5 seconds, and then stand over the victim and shoot again. Palmer's only explanation for how this fact supports his theory of a shooting based on a "rash impulse" is that little time elapsed between shots. This argument is not persuasive. Five seconds is certainly long enough to decide to cease shooting; here, it was long enough for Palmer to decide to fire additional shots. The acts of shooting, pausing, standing over a victim on the ground and shooting the victim multiple times does not support Palmer's rash-impulse theory.

### C.

During oral arguments, the State asserted, although the district court did not so find, that Palmer formed the intent to kill shortly before taking the gun from Da'Leino. The court held, by contrast, that the planning activity, motive, and nature of the killing supported the notion that Palmer had prepared for or considered the murder of Moss before he arrived at Moss's house. The court also stated that, in the alternative, "enough time existed between [Palmer's] arrival at Moss's house and the ensuing murder for [Palmer] to form the requisite premeditation." But the court did not make a finding of when Palmer formed the intent to kill. Premeditation must occur after intent to kill was formed, *Anderson,* 789 N.W.2d at 241, and therefore the district court implicitly concluded that Palmer had formed the intent to kill Moss sometime before the planning activity took place.[2] *See* Minn. R.Crim. P. 26.01, subd. 2(e) ("If the court omits a finding on any issue of fact essential to sustain the general finding, it must be deemed to have made a finding consistent with the general finding."); *Holliday,* 745 N.W.2d at 562.

But even if we credit the State's assertion and assume that Palmer did not form the intent to kill Moss until Moss threatened to call the police, there is ample evidence to affirm the conviction for first-degree premeditated murder. Palmer's actions after Moss threatened to call the police establish premeditation by motive and the nature of the killing. Palmer had a motive to stop Moss from calling the police and to help collect Da'Leino's money. The nature of the killing—i.e., the multiple shots from multiple angles and

**2.** The district court cited only actions occurring shortly before and during the killing as evidence of Palmer's intent to kill. But citing evidence of Palmer's intent to kill that occurred shortly before and during the killing does not necessarily indicate that the court concluded Palmer formed the intent to kill at that time. It could mean that the court found that the evidence relating to the nature of the killing was sufficient to address the issue of intent. *See State v. Cooper,* 561 N.W.2d 175, 179 (Minn.1997) (relying on only evidence relating to the nature of the killing to affirm a finding of intent to kill).

trajectories, the grouping of the wounds near the head and chest, the pause in shooting, and the description that Palmer "stood over [Moss] and finished him off"— also indicates premeditation.

The State is required to prove that Palmer considered, planned or prepared for, or determined to commit the killing "some appreciable time" after forming the intent to kill. Minn.Stat. § 609.18; *Moore*, 481 N.W.2d at 361. After Moss threatened to call the police and Palmer formed the intent to kill, Da'Leino pulled the gun out of his waistband and began to aim at Moss. Palmer then took the gun away from his brother and put it in his shooting hand, verbally responded to Moss's threat, aimed, fired two to three shots, paused for up to 5 seconds, and fired the remaining two to three shots. When he fired the remaining two to three shots, Palmer "stood over [Moss] and finished him off." Although the set of facts present a small window of time after Palmer formed the intent to kill, that window is still "some appreciable time" in which Palmer had time to consider or determine to commit the killing. Although in this instance Palmer's argument that the shooting was a "rash impulse" gets closer to a rational alternative to the State's theory of premeditation, it cannot overcome the fact that the last shots fired by Palmer were fired after a pause, and while standing over Moss, who was already on the ground.

Our past cases have held that defendants can premeditate a murder in a short amount of time. In *State v. Austin*, we held that premeditation was established by the amount of time it took to walk up a "short flight of stairs." 332 N.W.2d 21, 22, 25 (Minn.1983), *cited with approval in Yang*, 774 N.W.2d at 561. In this case, the amount of time passing between Moss's threat to call the police and the completion of the murder was comparable to that in *Austin*, which we recently reaffirmed in *Yang*. In *Holliday*, the shooter chased the victim and ran diagonally across a street while aiming at the victim and shooting, which we said contributed to a finding of premeditation. 745 N.W.2d at 560, 564. In *Holliday*, we also relied on *State v. Richardson*, 393 N.W.2d 657 (Minn.1986). In *Richardson*, we noted that "[a]lthough the shots that killed Smith came in rapid succession and, initially, in reaction to Smith's movement, defendant had to *make the decision* to chase after Smith and fire the last two or three shots." *Id.* at 665 (emphasis added). We held that this was evidence of premeditation. *Id.* In both *Holliday* and *Richardson*, the decision to chase was made quickly after the initial decision to brandish the gun or fire the gun, and the chase was presumably not very long in duration. Here, the amount of time to pause after the initial shots and then to decide to stand over the fallen victim to "finish[ ] him off" is similarly short.

And, as noted earlier, shooting a prone victim is evidence of premeditation. *See Clark*, 739 N.W.2d at 423. Thus, even when we consider only the motive and nature-of-the-killing evidence occurring after Moss threatened to call the police, we conclude that the killing was not done as a "rash impulse" but was premeditated.

## II.

Palmer makes several arguments in his pro se supplemental brief. Palmer first argues that his case was "more consistent" with first-degree heat-of-passion manslaughter or second-degree culpable-negligence manslaughter. Although Palmer never requested the district court to consider these lesser-included manslaughter offenses, Palmer argues that the court

erred by failing to consider these lesser-included offenses sua sponte.

■ We review the district court's failure to consider the lesser-included manslaughter offenses for plain error because Palmer, by not asking the court to consider these offenses, impliedly waived the claim. *See State v. Dahlin,* 695 N.W.2d 588, 597–98 (Minn.2005). When reviewing for plain error, we first ask "(1) whether there was error, (2) whether the error was plain, and (3) whether the error affected the defendant's substantial rights." *State v. Jenkins,* 782 N.W.2d 211, 229–30 (Minn.2010). If these three factors are met, we then ask whether the error needs to be addressed "to ensure fairness and the integrity of the judicial proceedings." *State v. Tscheu,* 758 N.W.2d 849, 863 (Minn.2008) (citation omitted) (internal quotation marks omitted). An error will affect a defendant's substantial rights when the error "had the effect of depriving the defendant of a fair trial." *Rairdon v. State,* 557 N.W.2d 318, 323 (Minn.1996); *see also Jenkins,* 782 N.W.2d at 230.

We conclude that any failure by the district court to consider manslaughter offenses could not have affected Palmer's substantial rights; therefore, it is not necessary to decide whether the district court committed an error that was plain. Here, there was no possibility that the district court's omission affected Palmer's right to a fair trial because the court's consideration of the lesser-included manslaughter offenses would not have altered the outcome. We have stated that "the jury's conclusion that the defendant acted with premeditation, despite the option of acquitting him of premeditated murder and finding him guilty of only intentional murder . . . demonstrated that the jury would not have found the defendant guilty of unintentional felony murder." *Dahlin,* 695

N.W.2d at 599 (citing *State v. Shepherd,* 477 N.W.2d 512, 516 (Minn.1991)). In this case, the court concluded Palmer committed first-degree premeditated murder, despite having the option of acquitting Palmer of premeditated murder and finding him guilty of second-degree intentional murder. The inclusion of manslaughter charges would not have affected the outcome. Therefore, even if the court erred, the court's failure to consider manslaughter charges sua sponte did not affect Palmer's substantial rights and was not reversible error.

■ Palmer's next pro se argument is that the district court incorrectly pronounced his sentence. Palmer's argument appears to be based on Minn.Stat. § 244.101, subd. 1 (2010), which states that "[w]hen a felony offender is sentenced to a fixed executed sentence," the executed sentence consists of a minimum term of imprisonment and a maximum term of supervised release.

Minnesota Statutes § 244.101, subd. 1, does not apply to this case. The district court sentenced Palmer to life in prison without the possibility of release, as required for his conviction of first-degree premeditated murder. *See* Minn.Stat. §§ 609.106, subd. 2(1), 609.185(a)(1) (2010). The court was not required to specify the minimum term of imprisonment and the maximum term of supervised release under section 244.101, because there is no possibility of release. Therefore, the court did not improperly pronounce Palmer's sentence.

■ Palmer's final pro se argument is that he received ineffective assistance of trial counsel because his attorney allegedly told him that he had no choice in whether he could receive a speedy trial or a jury

trial.[3] Palmer does not make any argument relating to this claim.

■ We conclude Palmer waived his ineffective assistance of trial counsel claims. Claims contained in a pro se supplemental brief with "no argument or citation to legal authority in support of the allegations" are deemed waived. *State v. Krosch*, 642 N.W.2d 713, 719 (Minn.2002); *see also State v. Ture*, 632 N.W.2d 621, 632 (Minn.2001). We do not consider arguments that the defendant has waived in this manner unless "prejudicial error is obvious on mere inspection." *State v. Bartylla*, 755 N.W.2d 8, 23 (Minn.2008) (internal quotation marks omitted). Palmer does not provide any argument on his ineffective assistance of counsel claim, nor does he cite to any legal authority.[4] There is nothing in the record to indicate obvious prejudicial error. Therefore, his ineffective assistance of counsel argument is waived.

To summarize, we have carefully reviewed Palmer's pro se brief and conclude that none of his claims merit relief.

Because we conclude that the evidence presented to the district court was sufficient to convict Palmer of first-degree premeditated murder, we affirm his conviction.

Affirmed.

MEYER, Justice (dissenting).

I respectfully dissent. The circumstantial evidence in this case does not lead unerringly to the conclusion that Palmer considered, planned, or prepared for the victim's death. I would reverse Palmer's conviction of first-degree premeditated murder and remand to the district court to vacate Palmer's life sentence and resentence him for second-degree intentional murder.

The distinction under Minnesota law between first-degree murder and second-degree murder is significant. To convict Palmer of first-degree premeditated murder, the prosecution was required to prove beyond a reasonable doubt that Palmer killed Moss with (1) intent to cause his death, and (2) premeditation. Minn.Stat. § 609.185(a)(1) (2010). Premeditation has been defined by the Legislature to mean "to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn.Stat. § 609.18 (2010). It is the element of planning or preparing to murder that transforms a second-degree intentional murder, an offense punishable by a maximum sentence of 40 years in prison, to a first-degree murder, punishable by life in prison without the possibility of release.

In *State v. Moore*, we made clear that premeditation cannot occur virtually instantaneously with the intent to kill. 481 N.W.2d 355, 360–61 (Minn.1992). We determined that the State must prove "that, after the defendant formed the intent to kill, some appreciable time passed during which the consideration, planning, preparation or determination required by Minn.

---

**3.** Palmer also argues that he received ineffective assistance of trial counsel because trial counsel allegedly failed to file a notice of appeal. Palmer's appellate counsel timely filed a notice of appeal on August 6, 2010, and we are deciding his appeal. *See* Minn. R.Crim. P. 29.03, subd. 3. Therefore, this claim is without merit.

**4.** Palmer also argues that the district court erred because it "intervened" in order to avoid a jury trial. This is not an argument for ineffective assistance of counsel. Moreover, Palmer waived his right to a jury trial in court, answering in the affirmative when asked if he understood that "[n]o one could force [him] to waive" the right to a jury trial and if he "had enough time to talk to [his] lawyer about this decision."

Stat. § 609.18 prior to the commission of the act took place." *Id.* at 361. In other words, an intent to kill that is formed virtually instantaneously with the act of killing will not be sufficient to support a finding of first-degree premeditated murder. If we blur the line between first- and second-degree murder, we do not give effect to the distinction the Legislature made in "punishing persons convicted of the different crimes differently." *Id.* It is the State's burden to prove that there was some passage of time between the formation of the intent to kill and the act of killing, and that during this time the defendant considered, planned, or prepared for the act.

Evidence that a defendant considered, planned or prepared for, or determined to commit murder is almost always based on circumstantial evidence. We examine the defendant's conduct, look at events before and at the time of the killing, and consider whether the circumstantial evidence, *taken as a whole,* leads unerringly to the conclusion that the murder was premeditated. *State v. McArthur,* 730 N.W.2d 44, 49 (Minn.2007); *State v. Andersen,* 784 N.W.2d 320, 332 (Minn.2010). I agree with the majority that we use a two-step analysis for deciding whether the circumstantial evidence was sufficient to prove premeditation. The first step is to "identify the circumstances proved, giving deference 'to the jury's acceptance of the proof of these circumstances.'" *State v. Anderson,* 789 N.W.2d 227, 241–42 (Minn. 2010) (quoting *Andersen,* 784 N.W.2d at 329). The second step is to determine whether the circumstances proved are "consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *Andersen,* 784 N.W.2d at 330. The evidence "must point unerringly to the accused's guilt." *McArthur,* 730 N.W.2d at 49 (citation omitted) (internal quotation marks omitted).

The following circumstances may be evidence of premeditation: (1) planning activity; (2) motive; and (3) the nature of the killing. *State v. Hughes,* 749 N.W.2d 307, 313 (Minn.2008). We have referred to planning activity as "facts about how and what the defendant did prior to the actual killing" that show the defendant was "engaged in activity directed toward the killing." *Id.* (citation omitted) (internal quotation marks omitted). Planning activity can include luring the victim to an isolated location and procurement of a murder weapon. *Anderson,* 789 N.W.2d at 242.

Palmer lived in Richmond and worked at Clearwater Cleaners in St. Cloud. He was longtime friends with Moss. They were both married and the father of two children. Palmer's relationship with Moss included spending time with each other's families. Around the time of the shooting, Palmer and his wife had been separated for several months. They were attempting to reconcile and, in the meantime, actively involved in raising their children.

Palmer had introduced Moss to Palmer's younger brother, Da'Leino. Da'Leino was unemployed and homeless. He regularly used marijuana and also sold marijuana and other drugs. When Moss became acquainted with Da'Leino they regularly "hung out" at Moss's home where the men would smoke marijuana together. They became involved in drug deals, with Da'Leino "fronting" drugs to Moss with the expectation that Moss would sell the drugs and then pay Da'Leino. Palmer knew about Da'Leino's lifestyle and disapproved of it, but was determined to stay involved in Da'Leino's life with the hope that he could be a positive force.

The relationship between Da'Leino and Moss deteriorated in the weeks before the shooting because Moss owed Da'Leino money for some drugs. Da'Leino tried

unsuccessfully to collect the money and finally became desperate for it because he was receiving threats from his dealer. Da'Leino ultimately decided to enlist Palmer's help in collecting the money from Moss.

On April 29, 2009, Da'Leino was scheduled to give Palmer a ride to work in St. Cloud using Palmer's car. Palmer had loaned his car to Da'Leino with the understanding that Da'Leino would drive Palmer to and from work. Da'Leino telephoned Palmer in the morning, explained that Moss owed Da'Leino money, and then asked Palmer to speak to Moss about the debt. This was Palmer's first notice that there was a problem between Moss and Da'Leino. Palmer's relationship with Moss was stable at that time. In fact, just four days before the shooting, Palmer and his children were at the Moss residence without conflict or any trouble between Moss and Palmer. Palmer agreed to speak to Moss.

On the day of the shooting, Da'Leino picked up Palmer to drive him to work. Da'Leino was in possession of a .22–caliber revolver. It was standard practice for Da'Leino to carry the loaded gun or have a friend carry it for him because he was a convicted felon. During the car ride Palmer loaded Da'Leino's revolver with bullets he took from his own pocket. Palmer had the bullets in his pocket because the last time he was with Da'Leino he had removed the bullets from the gun and placed them in his pocket. Palmer had removed the bullets because he did not want to have a loaded gun around his children. Da'Leino had asked Palmer to return the bullets, so Palmer brought them along and reloaded the revolver. Palmer admitted wiping the bullets before loading the gun so as not to leave his fingerprints on them. He then placed the gun under the seat of the car, a usual location for the gun.

Palmer and Da'Leino drove to Moss's duplex and waited about ten minutes for Moss to return home from picking his sons up at school. Da'Leino and Palmer went into the duplex with Moss. The revolver remained under the front seat of the car. The conversation quickly deteriorated into an argument over Moss's debt to Da'Leino. Da'Leino stormed outside. Unbeknownst to Palmer, Da'Leino went to the car to retrieve the revolver, planning to scare Moss, or perhaps Moss's neighbors. It was not entirely clear, but the evidence suggested that the neighbors had received some drugs from Moss without paying for them. Da'Leino tucked the revolver in the waistband of his pants and returned to the duplex.

Ultimately, the argument between the three men continued outside. According to a neighbor, the argument became "heated" and "loud." At some point Da'Leino pulled the revolver out of his waistband. Moss responded by saying he was going to call the cops. Palmer said "no you aren't," grabbed the gun from Da'Leino and shot Moss five times. Telephone records indicated that Moss attempted to call the police but apparently he was shot and dropped the telephone before he could complete the call.

Immediately after the shooting, Palmer ran down the alley. He threw his hat into a bucket, took off his red sweatshirt, wrapped the gun in it, and put it into a garbage bag. He was apprehended soon thereafter.

The evidence in this case must be considered as a whole, not in isolation. *See Andersen*, 784 N.W.2d at 332. The evidence as a whole supports at least two equally plausible explanations for Palmer's involvement in loading the gun. The fact that he wiped his fingerprints off of the cartridges before loading the cartridges into the gun may support the conclusion

that he was "preparing for an illegal use of the gun" (as the majority claims). Another possible conclusion is that Palmer wiped his prints off the cartridges because he knew about his brother's drug dealings and felony record and wanted to disassociate himself from his brother's illegal activities generally. Preparing for a future illegal use of a gun does not amount to planning to use the weapon to murder someone.

The most plausible explanation for Da'Leino bringing the gun with him is that the gun was to be used to scare Moss or his neighbor, if at all. It was Da'Leino who testified for the prosecution that he retrieved the loaded gun from the car in the course of the argument in order to scare Moss. It is equally plausible, therefore, that Palmer did not anticipate that the gun would be used at all that day. It was Da'Leino himself who testified that Palmer didn't know that Da'Leino had armed himself with the revolver. The revolver was left in the car, in a place where it was generally kept, with no preconceived plan by Palmer to use it.

As a backup theory, the prosecution in this case suggested that Palmer formed a plan to kill the victim in the moment before he began firing the gun, or in the span of two to five seconds after he began shooting. A span of two to five seconds, as a matter of law, is not an "appreciable" amount of time sufficient to conclude that the killing was planned. Even in those cases in which premeditation or planning activity occurred relatively quickly, there was much more time between the formation of the intent to kill and the act of killing. For example, in *State v. Netland*, 535 N.W.2d 328, 329–30 (Minn.1995), we noted that the jury could have inferred premeditation from evidence that the defendant forcibly entered the victim's house, obtained knives from the kitchen, walked down the hall, and stabbed the victim. *See*

*also State v. Leake*, 699 N.W.2d 312, 320 (Minn.2005) (finding premeditation where the defendant either brought a knife to the victim's apartment, or he went into the kitchen, retrieved a knife, and then returned to the victim's bedroom to kill her).

The majority cites to *State v. Austin*, 332 N.W.2d 21, 25 (Minn.1983), for the proposition that a defendant can premeditate a murder "in a short amount of time." But that case does not support the conclusion that a defendant premeditates a victim's murder in the instant before the defendant fires a gun or while a defendant is engaged in the act of shooting. In *Austin*, we found sufficient evidence of premeditation where after a gun fight in a bar, the defendant retreated to a bathroom, heard the victim talking outside of the bathroom, waited a few minutes, and then proceeded up a flight of stairs where he killed the victim. *Id.* at 23, 25.

Other circumstances are more consistent with the hypothesis that Palmer did not plan to shoot and kill his friend. He had a good relationship with Moss. He definitely exchanged angry words with Moss before the shooting. But all of the evidence suggested that Palmer and Moss had maintained a good relationship up until the time of the shooting. The relationship provided no explanation for the killing. On the contrary, the good relationship between the two men supports the reasonable inference that the killing was committed as a result of transitory anger.

The nature of the killing is consistent with an intentional killing. But there is nothing about the nature of the killing that demonstrates a preconceived plan to kill. In other words, the fact that Palmer pulled the trigger multiple times does not establish that he prepared for the shooting or considered or planned for it. The evidence is equally consistent with a shooting based on an unplanned, instantaneous, and rash decision.

I would conclude that the circumstantial evidence is equally consistent with a conclusion that there was no premeditation to kill. Therefore, the prosecution failed to prove beyond a reasonable doubt each element of first-degree premeditated murder. I would reverse Palmer's conviction and remand to the district court for the entry of a judgment of conviction for the offense of second-degree intentional murder.

PAGE, Justice (dissenting).

I join in the dissent of Justice Meyer.

ANDERSON, PAUL H., Justice (dissenting).

I join in the dissent of Justice Meyer.