**STATE of Minnesota, Respondent,**

**v.**

**Danny ORTEGA, Sr., Appellant.**

**No. A10–0765.**

Supreme Court of Minnesota.

April 18, 2012.

Lori Swanson, Attorney General, Kelly O'Neill Moller, Assistant Attorney General, St. Paul, MN; and Paul Kiltinen, Dodge County Attorney, Mantorville, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Melissa Sheridan, Assistant State Public Defender, Eagan, MN, for appellant.

## OPINION

STRAS, Justice.

Following a jury trial, appellant Danny Ortega, Sr. ("Ortega") was convicted of aiding and abetting first-degree premeditated murder, Minn.Stat. §§ 609.185(a)(1), 609.05, subd. 1 (2010), in the stabbing death of Troy Ulrich. Ortega challenges his conviction on appeal, arguing that (1) the district court erred in denying his motion to suppress his statements to investigators, and (2) the district court abused its discretion when it allowed the prosecutor to ask prospective jurors whether they believed there was anything more valuable than human life. Ortega also filed a pro se supplemental brief alleging numerous errors, including a claim that the evidence

was insufficient to convict him of premeditated murder. We affirm Ortega's conviction.

## I.

Troy Ulrich was stabbed to death in a garage at his apartment building in Claremont, Minnesota, on February 16, 2008. Ulrich lived in Apartment C with his fiancée. Ortega occasionally stayed across the hall in Apartment A, where Ortega's father, Severo Ortega, and Ortega's son, Danny Ortega, Jr. ("Junior"), resided. Ortega's brother-in-law, Arnulfo Bermea, Sr., also lived in the apartment building with his sons, Anthony and Eric Bermea. Arnulfo rented the garage where Ulrich was stabbed.

At trial, the State presented the following facts. On the afternoon of February 15, 2008, Ortega left Apartment A to go to a bar in Owatonna. Junior's girlfriend, Marissa Lane, was staying at Apartment A at the time and testified that she saw Ortega put a folding knife with a black handle in his pocket before he left.

After Ortega left, a group of people—including Junior, Lane, and Eric and Anthony Bermea—gathered in Apartment A to play cards and drink beer. When the group ran out of beer, Junior walked across the hall to Apartment C and asked Ulrich to join them. Shortly thereafter, Ulrich arrived at Apartment A with beer that he shared with the others. Several members of the group, including Junior, Ulrich, and Eric Bermea, snorted cocaine that evening.

Later that night, Ulrich told Eric and Anthony that Junior had warned Ulrich not to trust the Bermea brothers because they "were bad people to be hanging around." Angry at the accusation, the Bermeas confronted Junior. Junior denied making the comment and called Ulrich a liar, which led to an argument between Junior and Ulrich. To avoid a physical altercation, Eric, Anthony, and Ulrich left Apartment A and decided to continue drinking in the garage rented by Arnulfo. As they were leaving, the Bermeas heard Junior call Ortega and complain that "somebody was fucken [sic] with him and trying to fight him." According to Anthony Bermea, Junior then asked Ortega to come over to Apartment A "and do something."

Lane testified that Ortega was drunk when he arrived at Apartment A later that evening. Ortega and Junior spoke in Spanish, which Lane could not understand. Before leaving Apartment A, the Ortegas told Lane they were heading to the garage to confront Ulrich.

Upon reaching the garage, Ortega approached Ulrich and asked, "[w]hat the fuck you got with my son?" Ulrich responded that he did not have a problem with Junior. Eric testified that Ortega shoved Ulrich with both hands. Ulrich then pushed Ortega, who punched Ulrich in response. Ulrich picked up a light stand and hit Ortega with sufficient force to cause Ortega to bleed and fall to the ground. Shortly thereafter, Junior began striking Ulrich with a bolt cutter. Ortega then stood up, took the bolt cutter from Junior, and struck Ulrich with it.

Throughout the fight, Ulrich continued to back away from the Ortegas until they trapped him in a corner of the garage. Anthony testified that Ulrich slumped against a wall and pleaded with the Ortegas to stop. The Bermeas next heard Ulrich yell, "[h]e's got a knife." Neither brother saw a knife, but Anthony saw Ortega make stabbing motions as Ulrich said, "[s]top, stop with the knife. . . . Stop stabbing me." Ulrich then fell to the ground out of the brothers' line of sight, but the brothers observed both of the

Ortegas make stabbing motions and continue to beat Ulrich. At that point, the Bermeas left the garage.

The Bermeas returned to Arnulfo's apartment. At some point, Anthony went to Apartment A to tell the Ortegas that he wanted to call the police, but Ortega told Anthony, "[d]on't call the fucken [sic] cops." Anthony thereafter told Junior to move Ulrich's body. When Junior asked Anthony for help in moving the body, Anthony refused. The Bermeas decided not to call the police because Eric was worried that he would get in trouble for using cocaine earlier that evening.

Meanwhile, the Ortegas and Lane attempted to clean the scene and destroy incriminating evidence. After the altercation with Ulrich, Ortega and Junior had returned to Apartment A covered in blood; in fact, Lane testified that, at first, she could not even recognize Ortega. The Ortegas washed off the blood, and Lane used peroxide to clean a large cut on Ortega's head. Ortega put the bloody clothes into a plastic grocery bag, and then Junior told Lane to throw the bag in a trash dumpster located outside the apartment building. Ortega also cleaned the black folding knife with bleach before giving it to a friend to hide from the police. Junior and Lane returned to the garage and dragged Ulrich's body into the apartment hallway where numerous residents discovered the body the next morning. Upon hearing police sirens, Junior and Lane left and went to Lane's home in Austin, Minnesota, where Junior planned to catch a bus to Florida to stay with his mother.

Evidence recovered by police officers and forensic scientists from the Bureau of Criminal Apprehension (BCA) largely corroborated the Bermeas' testimony about the location and progression of the fight in the garage. Investigators found Ortega's tooth and a light stand with blood on it near the location where the Bermeas said the fight began. Bloodstains demonstrated that the fight moved from one end of a parked car to the other before proceeding to a corner of the garage. A pool of Ulrich's blood and hair found on the wall and floor of the garage confirmed that Ulrich fell to the ground and died in that corner.

The medical examiner, Dr. Michael McGee, testified that Ulrich suffered eight stab wounds and one puncture wound, causing Ulrich to bleed to death. Eight of the wounds were to Ulrich's chest or midsection, and one of the wounds was so deep that it broke through Ulrich's left rib, piercing Ulrich's lung and heart. Dr. McGee testified that the stab wounds were consistent with a knife that police recovered from Ortega's friend. Dr. McGee's autopsy also revealed that Ulrich was struck in the facial region six or seven times, suffered at least five blows to the head, and had defensive injuries on his body. Dr. McGee testified that there were no bruises on Ulrich's hand "that would indicate that he threw any punch."

The morning that investigators discovered Ulrich's body, the police arrested Ortega and took him to Claremont City Hall for questioning. According to the evidence presented at a contested omnibus hearing, BCA Agents Michael Wold and Dave Giguere initiated an interview with Ortega. However, after Ortega was informed he was under arrest and before Agent Wold could read a *Miranda* warning to Ortega, Ortega stated, "[w]ell then I'm not gonna say nothin' I just want to have an attorney present if you're gonna question me." Upon Ortega's invocation of his right to counsel, Wold and Giguere terminated the interview.

At the omnibus hearing, Dodge County Investigator Jeremy Gunderson testified that he conducted a second interview with

Ortega later that day, but the events leading up to that interview are disputed. Gunderson said that he was interviewing one of the Bermea brothers elsewhere in the building, but was aware that BCA agents were interviewing Ortega. Upon learning that Ortega had invoked counsel, Gunderson stated that he began arranging for Ortega's transportation to the county jail. In making those arrangements, Gunderson went to the room in which Ortega was being held in order to speak with Deputy Dean Valere about a transport car. Gunderson testified that when he entered the room, Ortega said "hi" and Gunderson "said hi back." Gunderson further testified:

> He took his hat off and showed me this wound on his head and said that they had . . . he had been struck or assaulted, and I told him that I could not get into the case because I . . . he . . . I was informed that he had requested counsel. So I could not talk to him about his case unless that he had requested to speak with me. ·

Valere testified that Gunderson was the first to say hello: "[Gunderson] and Danny [started] saying, 'Hey, how's it going, Danny.' And then [Ortega] goes, 'Well look what happened to my head man.' And [Ortega] took his hat off and . . . they just started talking." Valere further testified that Gunderson "did say before he left, 'Hey, I can't speak to you about the case. If you want to talk to me, then that's on you. You can let us know later if you want to talk to me.'" According to Valere, a few minutes after Gunderson left, Ortega told Valere and Deputy Robert Morris that he wished to talk with Gunderson. Valere then informed Gunderson that Ortega wanted to have a conversation with Gunderson.

At the omnibus hearing, Ortega gave a different account of his exchange with Gunderson. Ortega testified that Gunderson entered the room during his interview with Agents Wold and Giguere. According to Ortega, Gunderson said hello, Ortega returned the greeting, and then Gunderson grabbed a piece of paper from the table and left the room. Ortega alleged Wold then threatened him: "He said he could put me anywhere he wants in prison." Ortega said that Wold's statement "got me kind of scared." Ortega testified that Gunderson then returned to the room, where Wold told Gunderson that Ortega had invoked counsel and needed transportation to the county jail. Ortega stated that, after Wold left the room, Gunderson told Ortega, " 'I know you don't want to talk to . . . the big guys with the suits on.' He said, 'Would you want to talk to me, because we know each other and stuff.' " Ortega admitted that he later asked investigators for an opportunity to speak with Gunderson.

It is undisputed that Gunderson and Wold returned to the interview room after learning Ortega wanted to talk to Gunderson. The following recorded conversation then took place:

[GUNDERSON]: [A]gain I'm Investigator Gunderson. I'm down here because while they were getting ready to transport you, you you guys informed that you wanted an attorney, and you show[ed] me the knot on your head. Correct? (pause) Okay. And [you] made a statement that you were punched so I told you that yeah I wouldn't mind

[ORTEGA (interrupting)]: I even lost my tooth.

[GUNDERSON]: Okay. I wouldn't mind getting your side of the story, but you would have to waive your right to counsel and I said you'd have to request it from these guys. These guys came down and just told me that you want to talk with me. Is that correct?

[ORTEGA]: Yup

[GUNDERSON (to WOLD)]: Okay. Is that true? Is that what

[WOLD]: That is why and that's what happened. When we ended our interview, you told me that you wanted to talk to a lawyer when you were about to be transported.

[ORTEGA]: Oh yeah.

[WOLD]: When you were about to be transported you described an injury that we took photos of and [other agents] and myself all observed and also that you lost a tooth. At that point, you told me that you wanted to tell your side of the story to Detective Gunderson because you have a rapport with him, that you've dealt with him on other issues. Correct? (pause). Okay. So at this time, you're waiving your right to a lawyer and to visit with ah [Investigator Gunderson] at this time? (pause) Is that correct?

[ORTEGA]: I didn't hear you sir.

[WOLD]: I'm sorry. So at this time Mr. Ortega you're waiving your right to a a lawyer and to visit with [Investigator Gunderson] at this point?

[ORTEGA]: Yes.

Ortega then waived his rights after receiving a *Miranda* warning from Gunderson.

Gunderson continued the interview, and Ortega told Gunderson his version of the events that led to Ulrich's death. Ortega explained that he approached Ulrich in the garage and asked him, "what's the deal here? How come you want to fight with [Junior]?" Ortega admitted that he first pushed Ulrich. But Ulrich responded by removing his glasses, picking something up from the ground, and hitting Ortega in the mouth and head with it, which knocked out Ortega's tooth and caused blood to run into his eyes. Once Ulrich hit him, Ortega said he "really got mad" and "lost it."

Ortega said he pulled a knife from his pocket and stabbed Ulrich in self-defense. Ortega also stated that he believed Ulrich was on drugs because Ulrich "flipped" and would not stop hitting him.

Throughout the interview, Ortega answered all of Gunderson's questions except those relating to the location of the murder weapon. Gunderson asked Ortega about the location of the knife, but Ortega did not respond. Gunderson then gave a lengthy explanation of why it would be in Ortega's best interest to disclose the knife's location. The following exchange then occurred:

[GUNDERSON]: No. I don't think you're hiding a lot of other stuff. I'm just asking ... the only thing I wanted to do was to go get the knife. That's all I'm asking ya. That's the only thing I want to do is obviously your shirt you threw away. Yeah. It's ruined. Okay? But the knife I have to match up to the body. Okay? To show in in those wounds all right that was from that knife. All right? That helps me on my end and if you're like you are saying a victim of that then there shouldn't be a problem is what I'm trying to say to you, but if you're trying to hide it then now it makes me go why won't you want to give me the knife. You know what I mean. That's kind of strange.

[ORTEGA]: Cuz that there I would have to talk to an attorney on that first.

[GUNDERSON]: On the knife part?

[ORTEGA]: Yeah.

[GUNDERSON]: Okay. Okay. That's fine. But it just makes things ... do you understand? Kind of unusual. You know what I mean? That you just wouldn't say this is where I have things hidden at so. Okay?

Gunderson then redirected the questioning to issues other than the knife.

Before the district court, Ortega filed a motion to suppress his statements to Gunderson on the ground that Gunderson obtained the statements in violation of Ortega's right to counsel under the United States and Minnesota Constitutions. Specifically, Ortega argued that he invoked his right to counsel at the outset of the interview and his subsequent waiver of that right was invalid because (1) Agent Wold coerced Ortega's waiver by threatening him, and (2) Ortega suffered from a head injury at the time of the interview. Alternatively, Ortega argued the court should suppress any statements that he made after he unambiguously reinvoked his right to counsel when Gunderson asked him about the knife. The court denied Ortega's motion to suppress, holding that "[t]he totality of circumstances presented in the record indicate[d] that [Ortega] cooperated with Investigator Gunderson voluntarily, autonomously and willingly" and that "Gunderson's dialogue ha[d] characteristics designed to solicit clarification or otherwise engage [Ortega] in fair questioning while respecting [Ortega's] constitutional rights." Because the court denied Ortega's motion, the State played relevant portions of Ortega's recorded statements for the jury at trial.

During deliberations, the jury asked to hear again the statements in question. After listening to the statements, the jury returned guilty verdicts on each of the four counts of the indictment: aiding and abetting first-degree premeditated murder, Minn.Stat. §§ 609.185(a)(1), 609.05, subd. 1; aiding and abetting first-degree felony murder while committing or attempting to commit a burglary, Minn.Stat. §§ 609.185(a)(3), 609.582, subd. 1(a), 609.05, subd. 1 (2010); aiding and abetting second-degree intentional murder, Minn. Stat. §§ 609.19, subd. 1(1), 609.05, subd. 1 (2010); and aiding and abetting second-degree felony murder while committing second-degree assault, Minn.Stat. §§ 609.19, subd. 2(1), 609.222, subd. 1, 609.05, subd. 1 (2010). The district court then convicted Ortega of aiding and abetting first-degree premeditated murder and sentenced him to a term of life imprisonment without the possibility of release. This appeal followed.

II.

The first question presented in this case is whether the district court erred in denying Ortega's motion to suppress his statements to investigators. More specifically, Ortega argues that, after invoking his right to counsel at the beginning of his interview with Agents Wold and Giguere, investigators improperly reinitiated questioning. Ortega also argues that investigators failed to honor the reassertion of his right to counsel midway through his interview with Gunderson. We consider each of Ortega's arguments in turn.

A.

■■ We turn first to Ortega's argument that investigators improperly resumed their interrogation of him after he invoked his right to counsel at the outset of his interview with Agents Wold and Giguere. If a suspect invokes his right to counsel during a custodial interrogation, all questioning must cease, and the suspect "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the [suspect] himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Thus, once Ortega invoked his right to counsel, investigators could not interview Ortega unless he reinitiated discussions with them and knowingly and intelligently waived his right to counsel. *See*

*State v. Munson*, 594 N.W.2d 128, 139 (Minn.1999).

The parties agree that Ortega knowingly and intelligently waived his right to counsel when he responded affirmatively to Agent Wold's question about whether Ortega was waiving his right to an attorney in order to speak with Investigator Gunderson. But the parties disagree about whether Ortega reinitiated the discussion—which would permit the investigators to begin questioning Ortega after receiving a knowing and intelligent waiver of Ortega's right to counsel—or whether the investigators reinitiated the discussion—which would require Ortega's statements to be suppressed. We conclude that Ortega reinitiated the discussion with investigators.

A suspect reinitiates contact with police when the statements made by the suspect "represent a desire on the part of [the suspect] to open up a more generalized discussion relating directly or indirectly to the investigation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (plurality opinion). As the Supreme Court has recognized, a distinction exists between statements or questions "relating to routine incidents of the custodial relationship" and those that "evince[ ] a willingness and a desire for a generalized discussion about the investigation." *Id.* at 1045–46, 103 S.Ct. 2830. For example, the plurality in *Bradshaw* concluded that the question, "well, what is going to happen to me now?" constituted reinitiation by the suspect because "[i]t could reasonably have been interpreted by the officer as relating generally to the investigation." *Id.* at 1046, 103 S.Ct. 2830. On the other hand, we held in *State v. Staats* that a suspect who "asked about the extension of his 36–hour hold, a shower, and a phone call to his mother" did not reinitiate discussions with police

because those were questions incidental to the custodial relationship. 658 N.W.2d 207, 214 (Minn.2003).

The facts of this case more closely resemble *Bradshaw* than *Staats*. Ortega made two statements following his invocation of counsel. First, Ortega asked Gunderson to look at his head injury. Second, Ortega told deputies that he wished to speak to Gunderson. We need not determine whether Ortega's first statement constitutes reinitiation of discussion about the case because, given its context, Ortega's subsequent declaration that he wished to speak with Gunderson was a statement evincing a desire for a generalized discussion about the investigation.

When Ortega mentioned his head wound to Gunderson, Gunderson informed Ortega that the two of them could not discuss Ortega's case "unless [Ortega] requested to speak with" him. Gunderson further told Ortega that he "wouldn't mind getting [Ortega's] side of the story, but [that Ortega] would have to waive [his] right to counsel and ... request it from" the BCA agents. Thus, when Ortega asked to speak with Gunderson shortly after Gunderson left the room, an officer could reasonably interpret Ortega's statement as a request to engage in a generalized discussion with Gunderson about Ulrich's murder. *See Bradshaw*, 462 U.S. at 1046, 103 S.Ct. 2830 (examining how the officer may have "reasonably ... interpreted" the suspect's statement in determining whether the suspect reinitiated discussions with police); *State v. Miller*, 573 N.W.2d 661, 672 (Minn.1998) (holding that the suspect initiated further questioning when, after being told that he had to waive his right to counsel before speaking with investigators, the suspect replied, "I'd like to exercise that option"). Similar to the statement at issue in *Bradshaw*, therefore, Ortega's statement that he wished to speak to Gun-

derson constituted reinitiation of "further communication, exchanges, or conversations with the police" about the investigation. *Edwards*, 451 U.S. at 484–85, 101 S.Ct. 1880.

Ortega does not dispute that he asked to speak to Investigator Gunderson; rather, Ortega argues that it was Gunderson, not Ortega, who reinitiated the discussion after Ortega invoked his right to counsel. Specifically, Ortega points to three statements by Gunderson. First, Ortega claims that Gunderson told him, "Well, you don't want to talk to the guys in the suits, but you can talk to me." Second, after Ortega showed Gunderson the wound on his head, Gunderson said that they could not talk about the case unless Ortega requested to speak with him. Third, Gunderson said, "I told you that yeah I wouldn't mind ... getting your side of the story, but you would have to waive your right to counsel and I said you'd have to request it from these guys."

With respect to the first statement, the record is devoid of any evidence corroborating Ortega's claim that Gunderson told Ortega that he could talk to Gunderson rather than "the guys in the suits." After hearing Ortega's testimony at the omnibus hearing, the district court found that Ortega's description of some of the circumstances of the interrogation was "uncorroborated and incredible." Nothing in the record draws into doubt the district court's view of Ortega's credibility. With respect to the statement in question, Gunderson specifically denied telling Ortega that he could talk to him about the case rather than the "guys in the suits," and none of the deputies in the room substantiated Ortega's version of events. Instead, Deputy Valere, who was present with Ortega from the time Ortega first told Wold that he wanted an attorney to the time Ortega requested to speak with Gunderson, cor-

roborated Gunderson's account. Given the foregoing evidence and the district court's refusal to credit important parts of Ortega's testimony regarding the circumstances of the interrogation, we reject Ortega's claim.

■ In contrast to the first statement, the State concedes that Gunderson made both the second and third statements. Ortega argues that these statements, either together or standing alone, were sufficient to constitute reinitiation of the interrogation by Gunderson. We disagree. An officer reinitiates an interrogation if "the evidence in the record shows that the officers should have known that their conversation was reasonably likely to elicit an incriminating response from [the suspect] or to get [the suspect] to revoke his right to counsel." *Munson*, 594 N.W.2d at 142 (citing *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)). Our inquiry focuses on "the perceptions of the suspect rather than on the intent of the police, and must consider the totality of the circumstances surrounding the suspect's custody." *State v. Earl*, 702 N.W.2d 711, 719 (Minn.2005) (citing *Innis*, 446 U.S. at 301, 100 S.Ct. 1682).

■ The second statement—that Gunderson "could not talk to [Ortega] about his case unless ... he had requested to speak with me"—was simply an accurate restatement of the *Edwards* rule in response to Ortega's attempt to show Gunderson his head wound. It was not "reasonably likely to elicit an incriminating response" from Ortega or encourage Ortega to revoke his right to counsel. Indeed, we have concluded under similar facts that accurately clarifying a suspect's constitutional rights does not constitute reinitiation of interrogation or its functional equivalent. *See Miller*, 573 N.W.2d at 667, 672 (holding that police officers "scrupu-

lously" refrained from questioning the suspect when they responded to his repeated questions by explaining that they would not talk to the suspect unless he said, " 'I understand my rights. I want to talk to you without an attorney.' ").

■ The third statement—in which Investigator Gunderson recounted what had occurred during a prior exchange between Gunderson and Ortega—likewise does not constitute reinitiation of the interrogation by Gunderson. In this third statement, Gunderson reported that he had previously told Ortega that he "wouldn't mind ... getting [Ortega's] side of the story," but that Ortega "would have to waive [his] right to counsel" and gain permission from the BCA agents to speak with Gunderson. The context of Gunderson's statement is relevant because we evaluate questions relating to reinitiation following a suspect's invocation of his or her right to counsel in light of the totality of the circumstances. *See Earl*, 702 N.W.2d at 719; *Staats*, 658 N.W.2d at 214. Viewed in proper context, Gunderson's statement was responsive to Ortega's attempt to show Gunderson the wound on his head and to explain how he was injured. Although Gunderson expressed his willingness to hear Ortega's side of the story, Gunderson did not attempt to pressure or coerce Ortega into revoking his prior invocation of counsel. Nor did Gunderson's statement suggest that, if Ortega did not waive his right to counsel, Ortega's side of the story would remain unknown or Ortega's silence would otherwise hamper his defense. *Cf. State v. Ray*, 659 N.W.2d 736, 742–43 (Minn.2003) (holding that an officer impermissibly attempted to have a suspect revoke his right to counsel when the officer said that the suspect's invocation of counsel would prevent the police from sharing information with the suspect); *State v. Hannon*, 636 N.W.2d 796, 805 n. 2 (Minn.2001) (conclud-

ing it was improper for an officer to imply that a suspect's choice to speak with an attorney meant that the suspect would never have an opportunity to tell his side of the story). Rather, Gunderson accurately advised Ortega that they could speak about Ortega's case at that time only if Ortega elected to waive his prior invocation of counsel. We have upheld similar statements by officers in the past, *see Miller*, 573 N.W.2d at 672; *State v. Pilcher*, 472 N.W.2d 327, 332 (Minn.1991), and the facts of this case do not require us to reach a different conclusion here.

We therefore conclude that none of the three statements identified by Ortega constituted reinitiation of questioning by the investigators or an attempt to get Ortega to revoke his right to counsel. Accordingly, the district court did not err when it admitted Ortega's statements to investigators because, after requesting counsel, Ortega reinitiated the discussion with investigators and then validly waived his right to counsel.

## B.

■ Ortega further argues that, even if he validly waived his right to counsel, he reinvoked his right to counsel midway through Gunderson's questioning, and Gunderson failed to "stop and clarify" Ortega's request. Ortega points to the following exchange with Gunderson as evidence that he reinvoked his right to counsel:

[GUNDERSON]: [I]f you're like you are saying a victim of that then there shouldn't be a problem is what I'm trying to say to you, but if you're trying to hide [the knife] then now it makes me go why won't you want to give me the knife. You know what I mean. That's kind of strange.

[ORTEGA]: Cuz that there I would have to talk to an attorney on that first.

[GUNDERSON]: On the knife part?

[ORTEGA]: Yeah.

[GUNDERSON]: Okay. Okay. That's fine. But it just makes things … do you understand? Kind of unusual. You know what I mean? That you just wouldn't say this is where I have things hidden at so. Okay?

Ortega does not dispute that his statement, "[c]uz that there I would have to talk to an attorney on that first," was an equivocal request for counsel. *See State v. Ortega*, 798 N.W.2d 59, 70–71 (Minn.2011) (holding that the statement, " '[a]m I suppose[d] to have a lawyer present?' " was an equivocal request for counsel); *Pilcher*, 472 N.W.2d at 332 (concluding the defendant made an equivocal request for counsel when he asked whether the officer thought the defendant should have an attorney). Indeed, Ortega's statement did not specify whether Ortega was requesting Gunderson to cease the interrogation altogether or whether Ortega wanted to avoid further discussions about the knife because it would require him to consult with counsel.

■■■ The Supreme Court has held that an ambiguous request for counsel does not require the termination of an interview. *See Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); *see also Munson*, 594 N.W.2d at 139–40. But our case law imposes an additional obligation on officers when a suspect makes an equivocal request for counsel: officers must cease questioning the suspect except as to "narrow questions designed to 'clarify' the [suspect's] true desires re-

specting counsel." *State v. Robinson*, 427 N.W.2d 217, 223 (Minn.1988).

■■■ Gunderson complied with the "stop and clarify" rule by clarifying Ortega's equivocal request for counsel when he asked whether the request related only to "the knife part." Put another way, Gunderson's question ("On the knife part?") was a clarification of the indefinite antecedent "that" in Ortega's statement about counsel ("Cuz that there I would have to talk to an attorney on that first."). When Ortega confirmed "that" meant "on the knife part," Ortega's earlier statement could be read to say, "I would have to talk to an attorney about the knife." Ortega's statement indicates that he desired counsel's advice only for questions related to the location of the murder weapon. It does not evince a desire to cut off *all* questioning until counsel was present. Accordingly, Gunderson properly clarified Ortega's request because Gunderson asked a narrow question "designed to 'clarify' [Ortega's] true desires respecting counsel." [1] *Id.* We therefore conclude that the district court did not err when it admitted Ortega's statements to investigators.

### III.

■■■ The second question presented in this case is whether the district court abused its discretion when it allowed the State to ask potential jurors, "[d]o you think there is anything more valuable than human life?" The first time the State asked the question, Ortega objected on the ground that the question would not elicit

---

1. In arguing otherwise, Ortega focuses on Gunderson's statements immediately *prior* to Ortega's statement equivocally requesting counsel to contend that, rather than stopping and clarifying, Gunderson coerced Ortega to keep talking by suggesting "that Gunderson wanted to help [Ortega] establish a self-defense claim" and that Gunderson could help only if Ortega waived his right to counsel.

Yet Ortega's observation does not suggest that Gunderson violated the "stop and clarify" rule in this case because Gunderson made the statements in question *before* Ortega mentioned an attorney. Clarification under the "stop and clarify" rule applies only to statements made by officers *in response* to an equivocal request for counsel. *See Robinson*, 427 N.W.2d at 223.

meaningful information from a prospective juror. The district court summarily overruled the objection. From that point on, the State asked the question of all but one juror who sat on Ortega's jury.

Ortega contends the district court abused its discretion in permitting the question because it "was not designed to determine whether to exercise a peremptory challenge. Rather, it was a patent attempt to plant the idea that the jurors should reject Ortega's claim of self-defense because no one has the right to take someone else's life." The State counters that the district court did not abuse its discretion when it allowed the State to ask the question of jurors because it "helped determine the competency of the jurors to serve in a first-degree murder case." More specifically, the State contends that the question "was relevant for the parties to know if the jurors valued human life, or if they believed certain lives were not worth valuing."

We need not determine whether the district court abused its discretion in permitting the State to ask jurors the question at issue because, regardless of the propriety of the questioning, we conclude that the questioning did not affect the outcome of the case for three reasons. *See State v. Bolstad,* 686 N.W.2d 531, 543–44 (Minn. 2004) (declining to decide whether the State's voir dire questions were error, and instead dismissing the defendant's argument on the ground that any error was not prejudicial).

First, the State's questioning could have aided Ortega's case. In presenting a case of self-defense, Ortega was asking the jury to believe that he feared for his "human life" when he stabbed Ulrich. Consequently, asking jurors, "[d]o you think there is anything more valuable than human life?" may have caused the jurors to identify with Ortega and his theory of the case—

namely, that the murder in this case was justified because Ulrich threatened Ortega's life. Notably, *defense* counsel actually followed the State's lead in asking one juror whether his "moral beliefs also include a value of human life."

Second, the district court accurately instructed the jury on the elements of each of the offenses in the indictment, the requirements of self-defense, and the applicable burden of proof. Indeed, the district court emphasized in its instructions that jurors should not base their verdict on "bias, prejudice, or sympathy," weakening Ortega's claim that the jurors were motivated by improper considerations in convicting him. We must assume the jurors followed the district court's instructions. *See State v. Vang,* 774 N.W.2d 566, 578 (Minn.2009).

Third, the State never suggested in closing arguments that the jury should reject Ortega's claim of self-defense because no one has the right to take a life under any circumstances. *Cf. State v. Hill,* 801 N.W.2d 646, 658 (Minn.2011) (examining whether the State emphasized allegedly erroneous evidence in closing arguments in determining whether the alleged error was harmless). Rather, the State argued that, under the specific circumstances of this case, Ortega's killing of Ulrich was not justified under the doctrine of self-defense.

Accordingly, we conclude that Ortega is not entitled to a new trial because any error in the State's questioning of jurors during voir dire was harmless.

## IV.

Ortega raises six other claims in his supplemental pro se brief. Specifically, Ortega argues: (1) investigators violated *State v. Scales,* 518 N.W.2d 587, 592 (Minn. 1994), when they turned off the digital recorder between interviews with Ortega;

(2) the district court abused its discretion when it failed to order a Rule 20 competency evaluation at Ortega's request; (3) the State committed a discovery violation when it failed to disclose Ulrich's history of violent crimes; (4) the jury was not impartial because it did not contain any jurors of Ortega's race; (5) Ortega received ineffective assistance of trial counsel; and (6) the State did not present sufficient evidence to support Ortega's conviction of first-degree premeditated murder. We have carefully considered the first five claims and conclude that each lacks merit.

The last of Ortega's pro se claims—that the State's evidence was insufficient to support Ortega's conviction of first-degree premeditated murder—merits greater scrutiny. When considering a claim of insufficient evidence, our review "is limited to a painstaking analysis of the record to determine whether the evidence, when viewed in the light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989) (citing *State v. Martin*, 293 N.W.2d 54, 55 (Minn.1980)). We assume the jury believed the State's witnesses and disbelieved any evidence to the contrary. *State v. Moore*, 438 N.W.2d 101, 108 (Minn. 1989). And we will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense. *Bernhardt v. State*, 684 N.W.2d 465, 476–77 (Minn.2004).

In this case, the State relied heavily on circumstantial evidence to prove that Ortega premeditated Ulrich's murder. A conviction supported by circumstantial evidence requires us to apply a two-step inquiry:

First, we must identify the circumstances proved, giving deference to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State. Second, we independently examine the reasonableness of all inferences that might be drawn from the circumstances proved, including inferences consistent with a hypothesis other than guilt. Thus, our review consists of determining whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt.

*State v. Anderson*, 789 N.W.2d 227, 241–42 (Minn.2010) (citing *State v. Andersen*, 784 N.W.2d 320, 329–30 (Minn.2010)) (internal quotation marks omitted). We consider "three categories of evidence relevant to an inference of premeditation: planning activity, motive, and the nature of the killing." *State v. Yang*, 774 N.W.2d 539, 560 (Minn.2009).

Planning activity includes "facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing." *State v. Hughes*, 749 N.W.2d 307, 313 (Minn.2008) (citation omitted). Here, the State's evidence of planning activity came from the progression of the fight itself. The Bermeas testified that the Ortegas beat and followed Ulrich until they trapped him in a corner of the garage. Forensic evidence, including Ortega's bloody handprints and a pool of Ulrich's blood, corroborates the Bermeas' testimony. Making the decision to chase a victim is circumstantial evidence of premeditation. *See, e.g., State v. Holliday*, 745 N.W.2d 556, 564 (Minn.2008); *State v. Richardson*, 393 N.W.2d 657, 665 (Minn. 1986); *State v. Jones*, 347 N.W.2d 796, 801 (Minn.1984). Moreover, Anthony Bermea

testified that when Ulrich was losing the fight, he slumped against a wall and pleaded with the Ortegas to stop their attack. Yet, as Ulrich fell to the ground, the Bermeas heard Ulrich say that Ortega had a knife, saw Ortega make stabbing motions, and heard Ulrich say, "[s]top, stop with the knife.... Stop stabbing me." Given Ulrich's pleas and the forensic and eyewitness evidence, a sufficient amount of time passed for Ortega to premeditate the murder by "consider[ing], plan[ning] or prepar[ing]" to kill Ulrich. Minn.Stat. § 609.18 (2010) (defining premeditation); *see also State v. Palmer,* 803 N.W.2d 727, 738–39 (Minn.2011) (holding that premeditation can occur in a short amount of time, even after a fight has already commenced); *State v. Moore,* 481 N.W.2d 355, 362 (Minn.1992) (concluding that defendant's statement, "[g]ood-bye Debra, I am going to kill you now" before defendant shot the victim "permit[ed] an inference that defendant had sufficient time to contemplate his actions before carrying them out").

 Motive evidence includes "prior threats by the defendant to do violence to the victim, plans or desires of the defendant which would be facilitated by the death of the victim, and prior conduct of the victim known to have angered the defendant." *Moore,* 481 N.W.2d at 361 (citation omitted). Evidence of motive is not necessary to find premeditation, but it can help demonstrate that a defendant deliberated before killing. *Palmer,* 803 N.W.2d at 735. Having held that the district court properly admitted Ortega's statements to investigators, Ortega's statement that he was "pissed" is indicative of his motive for the killing. The jury could infer that Ortega began the fight to "take care of" an individual who had been involved in an altercation with his son, and when Ulrich fought back, Ortega decided to kill Ulrich. Put differently, the State's evidence estab-

lished that Ortega's decision to confront Ulrich on behalf of his son motivated the murder.

Finally, we examine evidence about the nature of the killing, such as "the number of wounds inflicted, infliction of wounds to vital areas, ... passage of time between infliction of wounds, and a defendant's concern with escape rather than with rendering aid to the victim." *State v. McArthur,* 730 N.W.2d 44, 50 (Minn.2007) (citation omitted). Here, the State proved that Ulrich was stabbed eight times and the Ortegas delivered seven of those blows to Ulrich's chest and midsection, indicating that they were aiming for Ulrich's vital organs. In his statement to investigators, Ortega admitted that he left Ulrich bleeding in the garage, which evinced a "concern with escape rather than rendering aid." *Id.* The State also elicited extensive testimony about the measures Ortega took to escape detection, such as: (1) refusing to call the police; (2) cleaning the bloody knife with bleach; (3) asking his friend to hide the knife; (4) disposing of bloody clothing; and (5) arranging for Junior's flight from Claremont. Thus, the nature of the killing in this case provides additional support for the jury's finding of premeditation.

We also conclude that the circumstances proved at trial are inconsistent with an inference that Ortega is innocent of premeditated first-degree murder. *See Andersen,* 784 N.W.2d at 331 ("We must next determine whether the reasonable inferences that can be drawn from the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis other than [the defendant]'s guilt."). In this case, the Ortegas pursued Ulrich across the garage and trapped him in a corner. They then stabbed him multiple times near his vital organs even after Ulrich pleaded for them to stop. The facts of this case are similar to *Palmer,* in which

we concluded that evidence that a defendant shot, paused, and then stood over his victim to "finish[ ] him off" was inconsistent with an argument that the killing was done as a rash impulse. *See Palmer*, 803 N.W.2d at 737–38. Like *Palmer*, the circumstances proved by the State in this case are inconsistent with any rational hypothesis except that of Ortega's guilt for first-degree premeditated murder.

Therefore, we conclude that the evidence in this case was sufficient to permit the jury to find Ortega guilty of first-degree premeditated murder.

### V.

For the foregoing reasons, we conclude there is no reversible error in this case. Accordingly, we affirm Ortega's conviction of first-degree premeditated murder.

Affirmed.