*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A13-1027**

State of Minnesota,
Respondent,

vs.

Randy Donald Reed,
Appellant.

**Filed July 28, 2014**
**Affirmed**
**Reyes, Judge**

Morrison County District Court
File No. 49CR102035

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Brian J. Middendorf, Morrison County Attorney, Todd L. Kosovich, Amber M. Kusler, Assistant County Attorneys, Little Falls, Minnesota (for respondent)

Mark D. Kelly, St. Paul, Minnesota (for appellant)

Considered and decided by Reyes, Presiding Judge; Reilly, Judge; and Stoneburner, Judge.\*

---

\* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**REYES**, Judge

On appeal of his conviction of first-degree arson under Minn. Stat. § 609.561, subd. 1 (2010), appellant argues that there was insufficient evidence to support his conviction.  We affirm.

## FACTS

On August 24, 2010, police and firefighters were called to a house fire at appellant Randy Donald Reed's home near Pierz, Minnesota, which appeared to have originated at the bottom of the house's basement stairs.  Firefighters found a butane torch near the stairs with the valve turned on and noticed windows lying on the ground outside the house alongside a framed picture, as well as empty picture frames hanging on a wall inside.  While police and firefighters were at the house, Reed and his girlfriend, B.S., pulled up to the house.  Reed calmly asked a deputy sheriff what was going on.  Reed stated that he had left a torch and a gas can, which contained about a gallon of gas, in the basement at the bottom of the stairs near the dryer.

Finding the situation suspicious, police called the state fire marshal to investigate. The fire marshal's investigation revealed (1) traces of gasoline in the basement but no sign of a gas can; (2) several points of origin of the fire; (3) that items had been removed from the home shortly before the fire, including pictures and recreational equipment; and (4) that Reed and B.S. had suffered financial hardship and the house was in foreclosure. Based on these findings, the fire marshal concluded that the fire was a result of arson.

Reed was charged with first-degree arson of a dwelling under Minn. Stat. § 609.561, subd. 1.

At Reed's jury trial, the state presented testimony from the fire marshal, firefighters, police officers, insurance representatives, and a fire investigator hired by Reed's insurance company. Various firefighters testified to the following facts: a car belonging to Reed and B.S. backed up to the house shortly before the fire with its trunk open and smoke was visible; a framed photo of a deceased family member was found on the grass outside the house, near where the car had been parked, and was not burned or dirty; the doors to the house were locked when they responded to the fire; a butane torch leaking gas was found at the bottom of the stairs; there were windows in the grass 20 feet from the house that looked like they had been removed from their framing; there were empty picture frames hanging in the hallway of the house; and the attic access hatch was ajar. The fire marshal also testified that he found a partially unrolled roll of toilet paper in a bathroom sink with the end draped over a hair dryer that had been turned off and that it looked like it was staged to be a "trailer" from an ignition source. Similarly, a fire investigator hired by Reed's insurance testified that there was toilet paper extending across the kitchen floor, leading to the dishwasher.

Reed's insurance agent testified that Reed had called the day before the fire to confirm that his policy was paid and current on both his home and auto insurance and that Reed was the only insured on the policy. An investigator for Reed's insurance company testified that when she interviewed Reed, he stated that he had left a gas can in the basement that had a gallon of gas in it, that he was the last person to leave the basement,

3

and that he arrived at his parents' house 15 minutes after B.S. Reed also told his agent that he had recently removed a pool table and hockey table for consignment and had taken drawings and pictures out of the house to make copies of them.

A recorded statement from Reed, taken a few days after the fire, was played for the jury. In the recording, Reed explained that he had just moved back into the house, where B.S. and her children were residing, a few days before the fire. He also admitted that he and B.S. were unemployed, had not made a house payment since March of 2010, owed $127,000 on the house, and had it insured for about $190,000. Reed stated that he and B.S. had left the house on the day of the fire between 1:00 and 1:30 p.m. to go to his parents' house to do farm chores and pick up B.S.'s daughter, and they arrived back home at about 3:45 p.m.

The fire marshal testified that he determined during his investigation that there was no gas can on the stairs as Reed had claimed, as indicated by the fact that the back riser on the left-hand side of the stairs was burned away, but the steps were intact and there were no melted "pancake" remains of the can. The fire marshal also testified that there were multiple points of origin of the fire, including at the bottom of the stairs, a wooden chair, an automobile chair, and a clothes basket, based on the extent of the damage and the burn patterns, which showed no connection between the fires. And he determined that the fire was not spread from fire or heat radiating from above based on the lack of damage done to the top part of the automobile chair. The fire marshal also explained that he could smell gasoline in the basement and an ignitable liquid was detected near the areas of the fire's origins, as determined by a hand-held tester.

4

Evidence sent for forensic analysis tested positive for gasoline. Based on the physical evidence, the financial situation of the homeowners, and having ruled out other possible causes, the fire marshal concluded that the fire was a result of arson.

The expert fire investigator hired by Reed's insurance company also testified that there were multiple points of origin of the fire, that the fire pattern was inconsistent with Reed's story that he had left a gas can in the basement, and that the localized burn pattern on the wooden chair indicated that the fire was not started from above. He explained that there was a "trailer" of clothing objects leading to the clothes basket that was meant to spread the fire. He determined that the fire near the stairs was localized and caused by gasoline on the floor and fueled by the contents of the shelf near the stairs, accounting for the charring on the ceiling rafters. The fire investigator noted that the damage to the automobile chair was localized and that the back of the chair and items on top of the chair were not burned, signifying that the fire was isolated and not influenced by other fire in the room. Like the fire marshal, the fire investigator concluded that the fire was intentionally set, testifying that the nature of the fire was typical of fraud fires because the perpetrator tried to create the appearance of an accidental fire, as illustrated by the trailers of toilet paper on the first floor of the house.

Reed presented expert testimony in his defense that the fire was accidental. The defense expert testified that gas vapor had leaked out of the nozzle of the gas can, which was sitting on the steps, and was ignited by the nearby operating dryer, resulting in a fire that trailed back to the can and caused a blow-torch effect from the nozzle. He noted scorching near the dryer and burning of the risers on the stairs and nearby shelving unit as

evidence of this. He relied on the warning label on gas cans to affirm that static electricity can cause fires. The defense expert also explained that the gas can was not found because it was totally consumed by the fire or washed away by the firefighters' high-pressure water hoses. In explaining the pattern of the fire damage, Reed's expert testified that the various burn areas were attributable to "fall down" from fire and heat radiating from above, noting that different materials have differing ignition temperatures, which is why the burning was not uniform. He also explained that a pressure change caused when fire finds fresh oxygen blew out the windows on the main floor and accounted for the framed picture being outside and the attic hatch being ajar.

The fire marshal and fire investigator testified that the defense expert's theory was implausible because (1) not enough vapor would have escaped from the gas can to ignite a fire in the timeframe given by Reed; (2) the theory did not account for the multiple points of origin; (3) there was no evidence of the gas can on the steps, noting that the tread and paint on the stairs remained intact; and (4) the basement did not reach the required temperature to blow out the windows in the manner suggested by Reed's expert.

Reed testified that he did not intentionally start the fire. He explained that he had left the butane torch in the basement after finding it in the yard and that "everybody knew" that they could get into the house through a bedroom window. And he testified that he saw a big glob of plastic in the basement when he got back into the house several weeks after the fire.

The jury found Reed guilty of first-degree arson. Reed moved for a new trial, which was denied, and he was sentenced to 60 months in prison. This appeal follows.

6

**D E C I S I O N**

We conduct "a painstaking analysis of the record to determine whether the evidence, when viewed in the light most favorable to the conviction," is sufficient to allow the jurors to reach a verdict of guilty. *State v. Ortega*, 813 N.W.2d 86, 100 (Minn. 2012) (quotation omitted). We assume that "the jury believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Caldwell*, 803 N.W.2d 373, 384 (Minn. 2011) (quotation omitted). "And we will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense." *Ortega*, 813 N.W.2d at 100 (citation omitted).

To convict Reed of first-degree arson, the state was required to prove that he intentionally destroyed or damaged the house by means of fire or explosives. Minn. Stat. § 609.561, subd. 1. Reed asserts that his conviction must be overturned because the circumstantial evidence used to convict him was insufficient to allow the jurors to find that he intentionally set the fire. Because "[a] conviction based on circumstantial evidence . . . warrants heightened scrutiny," we apply a two-step analysis to determine whether the evidence was sufficient to support the conviction. *State v. Al-Naseer*, 788 N.W.2d 469, 473 (Minn. 2010) (citation omitted). First, we identify the circumstances proved, deferring to the jury's acceptance of these facts and assuming that the jury rejected all contrary facts. *State v. Silvernail*, 831 N.W.2d 594, 598-99 (Minn. 2013). Second, we determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except guilt. *Id.* at 599. "We give no deference

7

to the factfinder's choice between reasonable inferences." *Id.* (quotation omitted). To sustain a conviction, the circumstances proved must form "a complete chain that, in view of the evidence as a whole, leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *Al-Naseer*, 788 N.W.2d at 473 (quotation omitted).

Reed contends that the evidence does not support his conviction because (1) Reed did not admit guilt; (2) the house was on a well-traveled highway; (3) Reed was not home when the fire was detected and his travels were corroborated; (4) Reed was cooperative in the investigation; (5) none of the state's witnesses identified Reed as the cause of the fire; and (6) there is no "physical evidence identifying [Reed] to the cause of the fire." Reed also asserts that there was no evidence presented that eliminated the reasonable inference that the fire was accidental, pointing out that the fire investigator admitted that, under certain circumstances, a remote ignition source could ignite a gas can and citing the warning on gas cans that aligns with the fact pattern suggested by Reed's expert. But Reed's arguments seem to ignore the directive that this court defers to the jury's acceptance of facts, assuming it believed the state's witnesses and rejected contrary evidence. *See State v. McDonald*, 394 N.W.2d 572, 576 (Minn. App. 1986) ("The determination of the credibility of the witnesses and the weight of their testimony was exclusively within the province of the jury.").

In light of this deference, the circumstances proved at trial are that the fire at Reed's house had multiple points of origin fueled by poured gasoline and ignited by a butane torch. Additionally, various scenarios were staged to resemble an accidental fire,

8

such as the toilet paper trailing toward a hair dryer. Likewise, the attic hatch was opened, which would aid in the spread of the fire. The circumstances proved also show that Reed, who was the last person in the house, left shortly before the fire was detected, had removed sentimental and valuable items from the house, and was unsurprised to learn of the fire. Moreover, Reed had checked the status of his insurance policy the day before the fire and was the only insured on the policy. Finally, he was in financial distress because he was unemployed and behind on his mortgage payments.

The reasonable inferences from these proved circumstances are that (1) the fire was set intentionally and not the result of an accident; (2) Reed had the means, opportunity, and intention to start the fire; (3) Reed acted suspiciously before the fire; and (4) Reed had a financial motive for starting the fire and making it appear unintentional. Even though Reed provided an explanation for various circumstantial evidence, we consider the totality of the evidence demonstrating motive, means, and opportunity to determine whether it sustains the conviction. *State v. Conklin*, 406 N.W.2d 84, 87 (Minn. App. 1987). Here, viewing the evidence as a whole, the circumstances proved form a complete chain that leads so directly to Reed's guilt as to exclude beyond a reasonable doubt any other reasonable inference. *Al-Naseer*, 788 N.W.2d at 473. The evidence presented was sufficient for the jury to find that Reed intentionally started the fire to destroy his home and supports his conviction for first-degree arson.

**Affirmed.**