*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-0716**

State of Minnesota,
Respondent,

vs.

Ryan Timothy Kellen,
Appellant.

**Filed April 8, 2024**
**Affirmed**
**Johnson, Judge**

Stearns County District Court
File No. 73-CR-20-376

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Janelle P. Kendall, Stearns County Attorney, River D. Thelen, Assistant County Attorney, St. Cloud, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Andrea Barts, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Johnson, Presiding Judge; Cochran, Judge; and Klaphake, Judge.*

---

*Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**JOHNSON**, Judge

A Stearns County jury found Ryan Timothy Kellen guilty of five counts of first-degree assault of a peace officer based on evidence that he used a pistol to shoot at an armored vehicle that was occupied by five police officers. We conclude that the evidence is sufficient to prove that Kellen intentionally used deadly force against the officers. Therefore, we affirm.

## FACTS

In January 2020, the state charged Kellen with two counts of felony domestic assault, in violation of Minn. Stat. § 609.2242, subd. 4 (2018), and five counts of first-degree assault of a peace officer, in violation of Minn. Stat. § 609.221, subd. 2(a) (2018). The charges are based on the following series of events, as described by the state's trial witnesses.

In the early morning hours of January 12, 2020, Kellen physically assaulted his then-wife at their home in the city of Sauk Centre. Kellen's wife left the house to go to work at approximately 6:00 a.m. Soon thereafter, Kellen began sending her text messages. In response to one of Kellen's messages, his wife wrote that police officers were "going to end up at the house." Kellen responded, "They will find me drunk with a loaded gun with a kid in the house." In subsequent messages, he wrote: "I'll pull a loaded gun on them. Go ahead, call them," and "You'll have a blood bath on your doorstep."

At approximately 6:30 a.m., Kellen's wife called 911. She told the dispatcher about Kellen's assault of her and the text messages that she had received from him. She also

stated that Kellen was "drunk," that he had "a loaded handgun," and that his nine-year-old son was asleep in an upstairs bedroom. She further stated that Kellen had "talked about killing himself" and "doesn't wanna go to jail."

Two Sauk Centre police officers responded to the 911 call. One officer spoke with Kellen's wife, while the other officer kept watch outside Kellen's house. At 7:35 a.m., a patrol sergeant placed two telephone calls to Kellen. Kellen did not answer the first call. After answering the second call, Kellen told the sergeant to "f-ck off" and hung up. The sergeant requested the assistance of negotiators and a special-weapons-and-tactics (SWAT) team. The Stearns and Benton County SWAT team responded.

At 8:24 a.m., a police negotiator placed a telephone call to Kellen. Kellen was "angry" and "belligerent" and told the negotiator that he had a loaded "single stack 1911" with nine rounds and that he "would shoot" if police "came to the house."

At 10:02 a.m., the negotiator placed another call to Kellen. During this call, Kellen stated: "There's only two ways this is gonna end. One of you f-ckers dead or me dead." He also stated, "You either leave me the f-ck alone . . . or I'm gonna start shootin'." Kellen told the negotiator that he would "open fire" if he saw police officers approach his house.

At approximately noon, Kellen allowed his son to leave the home. A police officer at the scene used a public-announcement system to inform Kellen that he was under arrest and was required to walk outside and surrender. Kellen did not do so.

Shortly before noon, the St. Cloud Police Department's SWAT team arrived at the scene. At 12:21 p.m., five members of the SWAT team approached the east side of Kellen's house in an armored vehicle. At 12:28 p.m., the negotiator heard a gunshot while

3

he was speaking with Kellen. Multiple other officers at the scene also heard the gunshot. During the negotiator's call, Kellen demanded to speak with his wife and said that he would "open fire again" if he was not allowed to speak to her within four minutes. Kellen told the negotiator that he is "a very good shot."

At 2:18 p.m., Kellen walked outside and surrendered to law enforcement. Police officers later searched his house pursuant to a warrant. They found a .45 caliber Taurus 1911 pistol and ammunition. Officers also observed a bullet hole in the glass and screen of a kitchen window, approximately 32 feet from the St. Cloud SWAT team's armored vehicle. During the investigation, multiple officers observed a fresh dent in the armored vehicle just behind the front left wheel, a mark in the snow beneath the armored vehicle, and a bullet in the alleyway behind the house. One officer testified that, given its trajectory, the bullet found in the alley was fired through the kitchen window, hit the armored vehicle, and ricocheted off the ground before stopping in the alley.

After his arrest, Kellen gave a statement to police officers. He admitted that he owned the pistol that was found in his house. When asked about the gunshot, Kellen said that his pistol "accidentally went off." Kellen explained that he "pointed the gun at the window" so that officers could see that he had a gun and "that's when it went off."

The case was tried on four days in November and December 2022. The state called 27 witnesses and introduced 142 exhibits. In addition to the testimony described above, a scientist from the bureau of criminal apprehension (BCA) testified that the pistol that was found in the house was fully functional and would not have discharged without the trigger being pulled. Kellen did not testify and did not introduce any evidence.

4

The jury found Kellen guilty on all counts. In February 2023, the district court imposed a prison sentence of 12 months and one day on the first conviction of felony domestic assault; two consecutive prison sentences of 120 months on the first two convictions of first-degree assault of a peace officer; and three concurrent prison sentences of 120 months on the three remaining convictions of first-degree assault of a peace officer. Kellen appeals.

**DECISION**

Kellen argues that the state's evidence is insufficient to support his convictions of first-degree assault of a peace officer. Kellen does not challenge his convictions of felony domestic assault.

To establish Kellen's guilt of first-degree assault of a peace officer, the state was required to prove that he assaulted a peace officer "by using or attempting to use deadly force against the officer" while the officer was "engaged in the performance of a duty imposed by law, policy, or rule." *See* Minn. Stat. § 609.221, subd. 2(a). The term "deadly force" is defined by statute to mean "force which the actor uses with the purpose of causing, or which the actor should reasonably know creates a substantial risk of causing, death or great bodily harm." Minn. Stat. § 609.066, subd. 1 (2018) (referenced by Minn. Stat. § 609.221, subd. 2(c)(2)). The statutory definition of deadly force includes "[t]he intentional discharge of a firearm . . . *at a vehicle in which another person is believed to be*." *Id.* (emphasis added).

In analyzing an argument that the evidence is insufficient to support a conviction, this court ordinarily undertakes "a painstaking analysis of the record to determine whether

5

the evidence, when viewed in the light most favorable to the conviction, was sufficient." *State v. Ortega*, 813 N.W.2d 86, 100 (Minn. 2012) (quotation omitted). We assume that "the jury believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Caldwell*, 803 N.W.2d 373, 384 (Minn. 2011) (quotation omitted). We will not overturn a verdict if the jury, "acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense." *Ortega*, 813 N.W.2d at 100.

The above-described standard of review applies so long as a conviction is adequately supported by direct evidence. *State v. Horst*, 880 N.W.2d 24, 39 (Minn. 2016). Direct evidence is "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." *State v. Harris*, 895 N.W.2d 592, 599 (Minn. 2017) (alteration in original) (quotation omitted). Circumstantial evidence, on the other hand, is "evidence from which the factfinder can infer whether the facts in dispute existed or did not exist." *Id.* (quotation omitted). A conviction depends on circumstantial evidence if proof of the offense, "or a single element of the criminal offense, is based solely on circumstantial evidence." *State v. Fairbanks*, 842 N.W.2d 297, 307 (Minn. 2014).

If a conviction depends on circumstantial evidence, we apply a heightened standard of review with a two-step analysis. *State v. Moore*, 846 N.W.2d 83, 88 (Minn. 2014). "The first step is to identify the circumstances proved." *Id.* The second step is to "examine independently the reasonableness of [the] inferences that might be drawn from the circumstances proved" and "determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *Id.* (alteration

6

in original) (quotations omitted). At the second step, we do not give deference to the jury's verdict. *Loving v. State*, 891 N.W.2d 638, 643 (Minn. 2017).

Kellen contends that the state's evidence is insufficient on the ground that it does not prove that he *intentionally* fired his pistol *at* the armored vehicle occupied by five police officers (rather than unintentionally firing the pistol or intentionally firing it merely in the general direction of the armored vehicle). To determine whether Kellen intended to shoot at the armored vehicle, we must consider the state's circumstantial evidence. *See State v. Cooper*, 561 N.W.2d 175, 179 (Minn. 1997).

At the first step of the circumstantial-evidence test, we must "identify the circumstances proved." *Moore*, 846 N.W.2d at 88. "In identifying the circumstances proved, we assume that the jury resolved any factual disputes in a manner that is consistent with the . . . verdict." *Id.* In this case, the numerous circumstances proved are fully stated above. *See supra* 2-5. The most significant circumstantial evidence consists of Kellen's own statements, which were admitted into evidence through the testimony of police officers. For example, only minutes before his pistol was fired, Kellen threatened to "open fire" if police approached his house. Shortly thereafter, Kellen threatened to "open fire again" if he was not allowed to speak with his wife. Kellen later admitted in a post-arrest statement that he "pointed the gun" before it fired.

At the second step of the circumstantial-evidence test, we must "examine independently the reasonableness of [the] inferences that might be drawn from the circumstances proved" and "determine whether the circumstances proved are consistent with guilt." *Id.* (alteration in original) (quotations omitted). Kellen does not contend that

7

the circumstances proved are inconsistent with guilt. The state contends that the circumstances proved are consistent with guilt. We agree with the state that the circumstances proved would support a reasonable inference that Kellen intended to fire his pistol at the armored vehicle.

At the second step of the circumstantial-evidence test, we also must determine "whether the circumstances proved are . . . inconsistent with any rational hypothesis except that of guilt." *Id.* (quotation omitted). Kellen contends that the circumstances proved do not eliminate three rational hypotheses of his being not guilty: (1) the pistol discharged accidentally, (2) he intentionally fired the pistol without aiming or looking to see what he was firing at or toward, and (3) he intentionally fired the pistol toward the ground.

Kellen's first hypothesis—that he did not intentionally fire the pistol because it discharged accidentally—is inconsistent with the circumstances proved. The state introduced ample evidence of Kellen's threats to shoot police officers. The state also introduced evidence that, in the minutes following the gunshot, Kellen stated to the negotiator that he would "open fire *again*" if police officers did not acquiesce to his demand to speak with his wife. (Emphasis added.) Although "a defendant's statements as to his intentions are not binding . . . if his acts demonstrated a contrary intent," we may infer that a person "intends the natural and probable consequences of his actions." *Cooper*, 561 N.W.2d at 179. In addition, a BCA scientist testified that Kellen's pistol would not have discharged unless Kellen had pulled the trigger. In light of Kellen's own statements both before and after the shooting and the BCA scientist's testimony, a jury could not rationally conclude that Kellen did not intend to fire his pistol.

8

Kellen's second hypothesis—that he intentionally fired the pistol without aiming or looking to see where he was firing it—is inconsistent with his post-arrest statement, in which he admitted to pointing the pistol at the window in response to seeing the SWAT team. One officer specifically testified that, based on the trajectory of the bullet, the pistol was "aimed towards the armored vehicle." Another officer testified that a bullet fired from Kellen's pistol actually hit the armored vehicle. In light of Kellen's own statements, the evidence of the trajectory of the bullet, and the evidence that the armored vehicle actually was struck by the bullet, a jury could not rationally conclude that Kellen did not aim the pistol at the armored vehicle.

Kellen's third hypothesis—that he intentionally fired the pistol toward the ground—is inconsistent with the circumstances proved for the same reasons that apply to his second hypothesis.

Given the circumstances proved, there is not a reasonable hypothesis that Kellen did not intentionally fire his pistol at the armored vehicle. Thus, the evidence is sufficient to support Kellen's convictions of first-degree assault of a peace officer.

**Affirmed.**