*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1068**

Ricky Alan Geving, petitioner,
Appellant,

vs.

State of Minnesota,
Respondent.

**Filed May 18, 2015
Affirmed
Johnson, Judge**

Isanti County District Court
File No. 30-CR-11-587

Cathryn Middlebrook, Chief Appellate Public Defender, Rachel F. Bond, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Jeffrey R. Edblad, Isanti County Attorney, Scott A. Hersey, Special Assistant County Attorney, Minnesota County Attorney's Association, St. Paul, Minnesota (for respondent)

Considered and decided by Johnson, Presiding Judge; Halbrooks, Judge; and Stoneburner, Judge.*

---

*Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**JOHNSON**, Judge

In 2011, Ricky Alan Geving was found guilty of first-degree assault on a peace officer based on evidence that he pointed a rifle at several law-enforcement officers. In 2014, Geving filed a petition for postconviction relief, arguing that the evidence was insufficient to prove that he intended to cause fear of immediate bodily harm or death. The postconviction court denied the petition. We conclude that the evidence was sufficient to prove that Geving intended to cause the officers fear of immediate bodily harm or death. Therefore, we affirm.

## FACTS

In September 2011, Geving was living in a pop-up camper trailer on a wooded property outside the city limits of Cambridge. A house and a detached garage were located at the bottom of a driveway that slopes downhill from the road. Two other campers were on the property, one of which was owned and occupied by a woman, B.J., who lived on the property and was in a relationship with the property owners' son at that time. B.J. had recently ended a relationship with Geving, who was struggling with other personal issues.

On the night of September 29, 2011, B.J. called 911 because Geving was making suicidal threats and had a rifle. The dispatcher contacted Investigator Robert Bowker of the Isanti County Sheriff's Office, who had spoken with Geving earlier that night about Geving's personal issues. Other officers from several law-enforcement agencies responded to the call. Investigator Bowker called Geving on his cell phone. Geving was

agitated about the squad cars on the property. Investigator Bowker encouraged Geving to talk with the law-enforcement officers, but Geving refused and said that he had his loaded rifle with him and "would shoot the first person who came to the door." Investigator Bowker radioed the officers on the scene and informed them of what Geving had said. Meanwhile, Deputy John McCarty approached Geving's camper, saw Geving through a window, and noticed that he appeared to be loading his muzzle-loader rifle. Upon hearing Investigator Bowker's radio call, Deputy McCarty backed away from the camper and instructed the other officers to position themselves at the end of the driveway.

Investigator Bowker arrived soon thereafter and again made contact with Geving by cell phone. Geving told him that he did not like the spotlights from the squad cars and wanted them turned off. After that call, Geving concealed himself by turning off the lights in his camper. Geving exited the camper, but officers did not realize this until he started yelling while standing on the driveway. Investigator Bowker told Geving to drop his rifle and reminded him of their earlier agreement that Geving would drop the rifle if Investigator Bowker came to the property. But Geving said that "plans had changed" and that he was not going to drop his rifle. Geving disappeared into a wooded area between the driveway and the campers.

Deputy McCarty moved his squad vehicle, a Chevrolet Tahoe, closer to the camper so that he could use the vehicle's spotlight to illuminate the camper and the nearby wooded area. Geving walked across the driveway to the other camper. Officers yelled at Geving to drop his rifle, which he was holding in a "low-ready position," which

3

indicated to officers that he was prepared to shoot. Geving said that he had 100 rounds of ammunition, that he was a good shot, and that he could hit targets up to 100 yards away. Deputy Chad Meyer used the spotlight on his squad vehicle to follow Geving, which agitated Geving further.

Geving stayed in the other camper for a short time and then emerged, again with the rifle in a "low ready" position, and with what Investigator Bowker characterized as an angrier, defensive demeanor. Geving walked toward the Tahoe, yelling at the officers to turn off the spotlights or he would shoot them out. The officers were approximately 30 to 40 yards away from Geving. Geving yelled "watch this." He turned the Tahoe's spotlight away from himself, though the spotlights on two other squad vehicles parked at the end of the driveway remained focused on him. Geving then leveled his rifle on the hood of the Tahoe, put the muzzle on his shoulder, pointed the barrel at the officers, leaned over, and looked through the scope. Deputy Meyer later testified that Geving's rifle was pointed directly at him. Deputy Meyer pulled the trigger on his rifle, intending to shoot Geving, but it jammed or misfired. Officer Chad Saelens of the Cambridge Police Department fired two rounds at Geving but missed him. After 15 to 20 minutes, officers convinced Geving to put down his rifle and lie on the ground, allowing officers to arrest him.

The next morning, Investigator Bowker questioned Geving at the Isanti County Jail. Geving stated that it was "very possible" that, when he was standing behind the Tahoe, he made a motion as if he was going to shoot and that he understood why the officers felt threatened. He stated that he could not see any of the officers at the end of

4

the driveway but could hear the officers yelling at him. He stated that he never intended to shoot any of the officers. Geving also said that he did not intend to kill himself that night but, rather, that "it was an attention getter."

In October 2011, the state charged Geving with one count of first-degree assault, attempt to use deadly force against a peace officer, in violation of Minn. Stat. § 609.221, subd. 2(a) (2010), and one count of second-degree assault with a dangerous weapon, in violation of Minn. Stat. § 609.222, subd. 1 (2010). Geving waived his right to a jury trial, and the district court held a two-day court trial in December 2011. The state called eight witnesses: B.J., six officers who were involved in the incident, and a firearms expert from the Bureau of Criminal Apprehension. All officers at the scene testified that they were afraid of being shot when Geving pointed his rifle in their direction. Geving did not present any evidence.

The district court issued an order in which it found Geving guilty on the first count, first-degree assault with attempted use of deadly force against a peace officer. The district court noted that the state also had proved the elements of the second count, second-degree assault with a dangerous weapon, but did not adjudicate Geving guilty of that offense because it is a lesser-included offense of first-degree assault. In March 2012, the district court sentenced Geving to the mandatory-minimum sentence of 120 months of imprisonment. *See* Minn. Stat. § 609.221, subd. 2(b) (2010).

Geving did not file a direct appeal. In February 2014, he petitioned for postconviction relief, seeking reversal of his conviction on the ground of insufficient

5

evidence of his intent. The district court denied the petition without an evidentiary hearing. Geving appeals.

**D E C I S I O N**

Geving argues that the postconviction court erred by denying his petition because the evidence was insufficient to prove that he intended to cause the officers fear of immediate bodily harm or death.

Geving was convicted of first-degree assault, attempted use of deadly force against a peace officer, in violation of Minn. Stat. § 609.221, subd. 2(a). That statute makes it a crime to "assault[] a peace officer . . . by using or attempting to use deadly force against the officer . . . while the officer . . . is engaged in the performance of a duty . . . ." Minn. Stat. § 609.221, subd. 2(a). The word "assault" is defined in the criminal code to mean "an act done with intent to cause fear in another of immediate bodily harm or death." Minn. Stat. § 609.02, subd. 10(1) (2010). The phrase "with intent to" is defined to mean "the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result." *Id.* at subd. 9(4). In assault-fear cases, "The intent of the actor, as contrasted with the effect upon the victim, becomes the focal point for inquiry." *State v. Hough*, 585 N.W.2d 393, 396 (Minn. 1998) (quotation omitted). An actor can commit the offense of assault-fear without knowing the exact identity of the intended victim or victims. *See id.* at 397 (affirming conviction though defendant did not know several victims were present).

In his postconviction petition, Geving argued that the state failed to prove the element of intent. The postconviction court denied relief on the ground that the state

6

proved beyond a reasonable doubt that Geving intended to cause the officers, and specifically Deputy Meyer, fear of immediate bodily harm or death. On appeal, Geving argues that the evidence was insufficient to prove that he intended to cause any of the officers fear of immediate bodily harm or death when he pointed his rifle in their general direction because he intended only to shoot out the spotlights that were pointed at him.

**A.**

We first must determine the applicable standard of review. Ordinarily, when reviewing the sufficiency of the evidence, we undertake "a painstaking analysis of the record to determine whether the evidence, when viewed in the light most favorable to the conviction, was sufficient" to support the conviction. *State v. Ortega*, 813 N.W.2d 86, 100 (Minn. 2012) (quotation omitted). We "assume that the factfinder disbelieved any testimony conflicting with the verdict," *State v. Palmer*, 803 N.W.2d 727, 733 (Minn. 2011), and "we will not disturb the verdict if the [fact-finder], acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense," *Ortega*, 813 N.W.2d at 100. "We use the same standard of review in bench trials and in jury trials in evaluating the sufficiency of the evidence." *Palmer*, 803 N.W.2d at 733.

If circumstantial evidence is necessary to support a conviction, however, we apply a different standard of review. *State v. Moore*, 846 N.W.2d 83, 88 (Minn. 2014). In those cases, the first step is to "identify the circumstances proved" and "assume that the jury resolved any factual disputes in a manner that is consistent with the jury's verdict." *Id.* (citing *State v. Andersen*, 784 N.W.2d 320, 329 (Minn. 2010)). The second step is to

7

"examine independently the reasonableness of the inferences that might be drawn from the circumstances proved," and then determine whether "the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *Id.* (quotations omitted). The reviewing court must consider the evidence as a whole and not examine each piece in isolation. *Andersen*, 784 N.W.2d at 332.

To determine whether to apply the traditional standard of review or the circumstantial-evidence standard of review, we ask whether the state has introduced sufficient direct evidence to prove each element of the crime. *See, e.g.*, *State v. Flowers*, 788 N.W.2d 120, 133 n.2 (Minn. 2010). If the state's direct evidence, by itself, proves each element of the charged offense, we apply the traditional standard of review; but if the state's direct evidence, by itself, is insufficient to prove each element of the charged offense, we apply the circumstantial-evidence standard of review. *State v. Porte*, 832 N.W.2d 303, 309-10 (Minn. App. 2013) (citing *State v. Silvernail*, 831 N.W.2d 594, 602-06 (Minn. 2013) (Stras, J., concurring)); *see also State v. Sam*, 859 N.W.2d 825, 831 (Minn. App. 2015) (applying circumstantial-evidence standard of review because state did not introduce direct evidence of possession of firearm). Direct evidence is "'evidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption,'" while circumstantial evidence is "'evidence based on inference and not on personal knowledge or observation.'" *Bernhardt v. State*, 684 N.W.2d 465, 477 n.11 (Minn. 2004) (alterations omitted) (quoting *Black's Law Dictionary* 595-96 (8th ed. 2004)).

8

Geving contends that the circumstantial-evidence standard of review applies. In general, intent is "generally proved circumstantially by drawing inferences from the defendant's words and actions in light of the totality of the circumstances." *State v. Cooper*, 561 N.W.2d 175, 179 (Minn. 1997). But the state contends that the traditional standard of review applies because its direct evidence is sufficient to prove Geving's intent. The state refers to the officers' testimony about Geving's statements and actions before and after he pointed his rifle at the officers. The state contends that the district court could have relied solely on this evidence to find Geving's intent, without making any inferences. The state cites *State v. McClain*, 208 Minn. 91, 292 N.W.2d 753 (1940), and the concurring opinion in *Silvernail* in support of this contention. The direct evidence in those cases, however, was the defendant's confession, which established that the defendant, and not another person, committed the charged offense. *See McClain*, 208 Minn. at 92, 292 N.W. at 753, *Silvernail*, 831 N.W.2d at 598. In the present case, it is undisputed that Geving was the person who pointed his rifle at the officers on the night in question. The element that is challenged on appeal relates to Geving's state of mind. The officers' testimony provides direct evidence of what Geving did and said during the incident, but it provides only circumstantial evidence of Geving's state of mind because the district court was required to draw inferences from Geving's actions and statements to make a finding about his intent. *See State v. Fort*, 768 N.W.2d 335, 343 (Minn. 2009) (characterizing defendant's statements that "'if you don't shut up, I'm going to kill you" and "now you're going to die" as circumstantial evidence of defendant's state of mind). Thus, we will apply the circumstantial-evidence standard of review.

9

**B.**

We engage in a two-step process when applying the circumstantial-evidence standard of review. *See Moore*, 846 N.W.2d at 88. First, we identify the circumstances proved during trial, which include the following: Geving was upset that law-enforcement officers were on the property. He told Investigator Bowker that he would shoot anyone who came to the door of his camper. He stated that he had 100 rounds of ammunition, that he was a good shot, and that he could hit targets up to 100 yards away. The officers were only 30 to 40 yards away from him when he pointed his rifle at them. Officers told Geving numerous times to drop his weapon, and he repeatedly refused. When Investigator Bowker reminded Geving that he had agreed to drop his rifle, Geving responded defiantly that "plans have changed." Geving turned off the lights in his camper, concealing his movements. When Geving walked across the driveway to the other camper, he held his rifle in a low-ready position. Officers testified that carrying a rifle in a low-ready position generally indicates that a person is ready to fire. Geving stated several times that he would shoot out the spotlights. Geving could hear the officers' voices coming from the same direction as the spotlights. The officers used the spotlights to follow Geving and track his movements. Geving placed his rifle on the hood of the Tahoe, pointed it in the direction of the spotlights and the officers, and looked through the scope. Geving's demeanor directly before he pointed his rifle at the officers was angry and defiant, not fearful. Deputy Meyer saw that Geving's rifle was pointed directly at him. All officers at the scene were afraid of being shot when Geving pointed his rifle in their direction. Both Deputy Meyer and Officer Saelens felt so threatened that

10

they used their own firearms to shoot at Geving. Geving admitted that he understood why the officers felt threatened by his actions. When asked whether he intended to kill himself that night, Geving said that "it was an attention getter."

Next, we consider whether the reasonable inferences from the circumstances proved are "consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *Andersen*, 784 N.W.2d at 330. Geving argues that it is reasonable to infer from the circumstances proved that he intended only to shoot the spotlights when he pointed his rifle at the officers and did not intend to cause the officers fear of immediate bodily harm or death. An individual acts with intent to cause a result when he "believes that his act, if successful, will cause that result." Minn. Stat. § 609.02, subd. 9(4); *see also Hough*, 585 N.W.2d at 396-97 (concluding that defendant intended natural and probable consequences of shooting at house). Geving knew that the officers were located near the spotlights. It is a reasonable inference that Geving intended to cause the officers fear of immediate bodily harm or death when he pointed his rifle in that direction, and it is not a reasonable inference that he did not intend to cause them fear of immediate bodily harm or death. Even if Geving's purpose was to shoot out the spotlights, the only reasonable inference is that he believed that doing so also would cause the officers to fear immediate bodily harm or death.

Thus, we conclude that the circumstantial evidence was sufficient to prove that Geving intended to cause the officers fear of immediate bodily harm or death. Therefore, the postconviction court did not err by denying Geving's petition.

**Affirmed.**

11